SD:KMP
F. #2015R00138/OCDETF#NY-NYE-773

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -

KAMEL LAMBUS,
      also known as "Kamel Angevine"
      and "K,"
STANLEY FULLER,
      also known as "Wardy" and "Webo,"
SHAVONA TRAPPIER,
      also known as "Bobby,"
SHAKEEM POWELL,
      also known as "Sha,"
TYRAN TROTTER,
      also known as "Ty," "Terry" and
      "Terror,"
FNU LNU,
      also known as "Chris,"
HENRY CURRY,
      also known as "Junior" and "Kash,"
SEAN BRABRAM,
      also known as "Grinch" and "Lye,"
TIHEEM CROCKER,
FNU LNU,
      also known as "Pop,"
SCOTT WILLIAMS,
EARL DAVIS,
      also known as "Choice,"
MICHAEL SCOTT,
      also known as "Ross," and
ANDRE MITCHELL,
      also known as "Dre" and "Bright,"

           Defendants.

– – – – – – – – – – – – – –X

EASTERN DISTRICT OF NEW YORK, SS:

15-602 M

C O M P L A I N T

(21 U.S.C. § 846)

CHRISTOPHER POPOLOW, being duly sworn, deposes and states that he is a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), duly appointed according to law and acting as such.

In or about and between November 1, 2014 and June 30, 2015, within the Eastern District of New York and elsewhere, the defendants KAMEL LAMBUS, also known as "Kamel Angevine" and "K," STANLEY FULLER, also known as "Wardy" and "Webo," SHAVONA TRAPPIER, also known as "Bobby," SHAKEEM POWELL, TRYAN TROTTER, also known as "Ty," "Terry" and "Terror," first name unknown ("FNU") last name unknown ("LNU"), also known as "Chris," HENRY CURRY, also known as "Junior" and "Kash," SEAN BRABRAM, also known as "Grinch" and "Lye," TIHEEM CROCKER, FNU LNU, also known as "Pop," SCOTT WILLIAMS, EARL DAVIS, also known as "Choice," MICHAEL SCOTT, also known as "Ross," and ANDRE MITCHELL did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved one kilogram or more of a substance containing heroin, a Schedule I controlled substance.

(Title 21, United States Code, Section 846)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.      I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations ("HSI") and have been involved in the

---

[1]      Because the purpose of this complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

investigation of numerous cases involving the distribution of narcotics.  During my tenure with HSI, I have participated in narcotics investigating during the course of which I have: (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, records of narcotics, money laundering transactions and firearms have been found; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers; (d) debriefed cooperating drug traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking and money laundering.  Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement.  I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendants' criminal history records; and from reports of other law enforcement officers involved in the investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

### The Paper Chasing Goons and "POV City"

2.       Since 2013, HSI and other law enforcement agencies have been investigating the narcotics trafficking activities of a group of individuals in the Queens, New York area.  Referring to themselves as the "Paper Chasing Goons" ("PCG") or "POV City," – a sect of the Bloods gang – this drug trafficking organization ("DTO") distributes narcotics throughout the Queens and Long Island areas of New York.  To date, the investigation has revealed that the DTO has ready access to substantial quantities of narcotics as well as firearms, and that certain members of the DTO distribute firearms.

3.     Physical surveillance, location data, and intercepted wiretap communications, as well as information obtained from confidential sources and law enforcement officers acting in an undercover capacity have revealed the hierarchy of the DTO, and the manner by which members of the DTO conduct their narcotics trafficking activities. In particular, the use of these investigative tools has revealed, among other things, that two of the leaders and organizers within the DTO are LAMBUS and FULLER, and that LAMBUS and FULLER obtain substantial quantities of heroin which they distribute to a network of distributors within the DTO, who then sell it to the DTO's customers.   Specifically, the investigation has also revealed that LAMBUS and/or FULLER supply heroin to TRAPPIER, POWELL, TROTTER, and FNU LNU (also known as "Chris") who supply a network of distributors within the DTO.   Members of this network include, among others: MITCHELL, DAVIS, BRABRAM,[2] SCOTT and FNU LNU (also known as "Pop").   The investigation has revealed that LAMBUS also distributes heroin directly to CURRY, CROCKER and WILLIAMS.

**Use of the 4421 TELEPHONE by TRAPPIER, POWELL, TROTTER and FNU LNU, also known as "Chris"**

4.     From February 12, 2015 until the present, law enforcement officers have intercepted both the wire and electronic communications over mobile telephone number 347-878-4421 (the "4421 TELEPHONE").   These communications have demonstrated that TRAPPIER, POWELL, TROTTER and FNU LNU, also known as "Chris" each use the 4421 TELEPHONE to, among other things, sell heroin to the DTO's customers, arrange to resupply

---

[2] The investigation has revealed that, in addition to TRAPPIER, LAMBUS also distributes heroin to BRABRAM.

individuals who sell heroin on behalf of the DTO, and arrange to receive heroin from LAMBUS.   Moreover, the investigation has revealed that TRAPPIER, POWELL, TROTTER and FNU LNU, also known as "Chris" also use the 4421 TELEPHONE to report the status of their heroin distribution activities to LAMBUS, who is one of the leaders of the DTO.

5.     The investigation has further revealed that members of the DTO mark the heroin they distribute with a variety of unique labels, including, but not limited to: "Pepsi," "Coca Cola," "Sweet Dreams," "First Take," "King Kong," "Undisputed," and a gold foil circle with a black fist and the word "Power" emblazoned on the fist.   Moreover, the investigation has revealed that the DTO has distributed over one kilogram of heroin to customers between November 1, 2014 and the present, and that the DTO distributes at least 300 glassines of heroin on a daily basis.[3]   The DTO also uses several residences as stash houses where its members store heroin and the proceeds of heroin sales, and distribute heroin.   These locations include 107-53 Watson Place, Queens, New York; 119-26 165th Street, Queens, New York and 193-04 Horace Harding Expressway, Fresh Meadows, New York.

6.     A more fulsome description of the specific involvement of each member of the DTO in the narcotics trafficking activities of the DTO is set forth below.

**KAMEL LAMBUS**

7.     As noted above, the investigation has revealed that LAMBUS is a high-level leader within the DTO, who distributes heroin to other mid-level leaders of the DTO, such as SHAVONA TRAPPIER, POWELL and TROTTER.   LAMBUS also arranges for the

---

[3] Based on my training, experience and knowledge of the investigation, I know that 90 glassines of heroin is approximately 3 grams of heroin.   A glassine is approximately one dosage of heroin.

heroin purchased by the DTO to be tested for quality, collects the proceeds of the DTO's heroin sales, and distributes heroin directly to his own customers.

        8.    Intercepted telephone conversations and location data reveal that on March 22, 2015 and March 25, 2015 LAMBUS supplied TRAPPIER with narcotics for distribution.   At approximately 5:07 p.m. on March 22, 2015, investigating agents intercepted the following telephone call between TRAPPIER, who was using the 4421 TELEPHONE, and FNU LNU (also known as "Universal"):

| | |
|---|---|
| TRAPPIER: | Yo! |
| UNIVERSAL: | What's up? |
| TRAPPIER: | I don't got nothing, I'm waiting for it right now. |
| UNIVERSAL: | All right, I seen your bro. He told you? |
| TRAPPIER: | Who? |
| UNIVERSAL: | He told me at 5:00 o'clock... your brother. You know who this is? |
| TRAPPIER: | Nah. |
| UNIVERSAL: | It's Uni... why you still ain't put me in your phone? |
| TRAPPIER: | I don't know. I'm about to call him right now cause he told me 5:00 o'clock too. |
| UNIVERSAL: | All right. I'll call you back, I'm on this side of town. I'll call you back. |
| TRAPPIER: | All right so let me call him right now and I'll call you right back. |
| UNIVERSAL: | All right. |

Based on my experience and knowledge of this investigation, I believe that during the above-referenced telephone call TRAPPIER told Universal that she did not have heroin, but her

supplier would be bringing her heroin later that day.   Specifically, I believe that Universal asked TRAPPIER if she had heroin available for sale (i.e., "What's up?"), and TRAPPIER responded that she did not have heroin available for sale, and was waiting to be resupplied (i.e., "I don't got nothing.   I'm waiting for it right now").   Universal stated that he understood, and told TRAPPIER that he saw her brother, POWELL (i.e., "All right, I seen your bro.   He told you?").   TRAPPIER then asked Universal who he was referring to when he stated that he saw her "bro" (i.e., "Who?"), and Universal told TRAPPIER that POWELL had told him that the stash house located at 107-53 Watson Place would be resupplied with narcotics by 5:00 p.m., and asked TRAPPIER if she knew Universal's identity (i.e., "He told me at 5:00 o'clock… your brother.   You know who this is?").   TRAPPIER responded that she did not know who he was (i.e., "Nah"), and Universal responded by informing TRAPPIER that she was speaking with Universal and asking TRAPPIER why she had not saved his telephone number in her telephone (i.e., "It's Uni… why you still ain't put me in your phone?").   TRAPPIER stated that she did not know why she had yet to put his telephone number in her telephone, and told Universal that she would call her source of supply because her source of supply previously had told her that he would give her narcotics by 5:00 p.m. (i.e., "I don't know.   I'm about to call him right now cause he told me 5:00 o'clock too").   Universal then acknowledged that he understood and told TRAPPIER that he would call her back (i.e., "All right.   I'll call you back").   TRAPPIER then told Universal that she would call her source of supply immediately and then call Universal (i.e., "All right so let me call him right now and I'll call you right back").

9.      At approximately 6:14 p.m. on March 22, 2015 investigating agents intercepted the following telephone call between LAMBUS and TRAPPIER, who was using the 4421 TELEPHONE:

| LAMBUS: | Yo! |
| TRAPPIER: | Yo! |
| LAMBUS: | Where you at? |
| TRAPPIER: | At the house. |
| LAMBUS: | Aight, stay there. |
| TRAPPIER: | Aight. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call, LAMBUS and TRAPPIER coordinated a resupply of heroin.  Specifically, LAMBUS asked TRAPPIER where she was physically located (i.e., "Where you at?"), and TRAPPIER replied that she was located at 107-53 Watson Place (i.e., "At the house").  LAMBUS then directed TRAPPIER to stay at 107-53 Watson Place so that he could resupply her with narcotics (i.e., "Aight, stay there"), and TRAPPIER responded that she understood (i.e., "Aight").

10.     At 6:24 p.m. on March 22, 2015 – which was approximately 10 minutes after the above-referenced conversation between LAMBUS and TRAPPIER – TRAPPIER spoke to UNIVERSAL, and told him that her source of supply was on the way.   Specifically, investigators intercepted the following telephone conversation between TRAPPIER, who was using the 4421 TELEPHONE, and Universal:

| TRAPPIER: | Hello! |
| UNIVERSAL: | What's up baby?   You ain't call me back.   What's the deal? |
| TRAPPIER: | He bringing it now. |
| UNIVERSAL: | Oh okay, all right.   So I'll hit you in about 10 minutes. |

Based on my experience and knowledge of this investigation, I believe that during this exchange, Universal asked TRAPPIER if she had been resupplied with heroin (i.e., "What's up baby?  You ain't call me back.  What's the deal?").   TRAPPIER responded by stating that her source of supply was bringing the heroin to her location (i.e., "He bringing it now").  Universal then replied that he understood and told TRAPPIER that he would call her in approximately 10 minutes (i.e., "Oh okay, all right.   So I'll hit you in about 10 minutes").

11.     During the course of this investigation, investigating agents obtained location data for the period between 6:24 p.m. and 6:35 p.m. on March 22, 2015.[4]   The location data revealed that LAMBUS traveled from the vicinity of 174-00 Polhemus Avenue, Jamaica, New York to the vicinity of 107-00 Watson Place, Jamaica, New York, between 6:28 p.m. and 6:29 p.m. on March 22, 2015.   107-00 Watson Place, Jamaica, New York is in the immediate vicinity of 107-53 Watson Place.   In addition to obtaining location data revealing LAMBUS's whereabouts, investigating agents monitored the video footage from a pole camera located in the vicinity of 107-53 Watson Place on March 22, 2015 at approximately 6:28 p.m.   At 6:28 p.m. – the same time that location data indicated that LAMBUS was in the vicinity of 107-53 Watson Place – law enforcement officers observed TRAPPIER opening the door to the residence located at 107-53 Watson Place and exiting the residence.   Video footage from the pole camera then depicted TRAPPIER exiting from the residence at 6:28:44 p.m. and returning to the residence at 6:30:42 p.m.

12.     Approximately 5 minutes after TRAPPIER returned to the residence at 107-53 Watson Place, she sent the following text message from the 4421 TELEPHONE: "I'm

_____

[4] LAMBUS is serving a term of parole in connection with a state narcotics conviction.   As a condition of his parole, LAMBUS is wearing an electronically monitored ankle bracelet, which provides location data for his whereabouts on a periodic basis.

back on."   Based on my training, experience and knowledge of the investigation, I believe that by sending this text message, TRAPPIER was informing one of her heroin customers that she had been resupplied with heroin.

13.   I believe that interception of telephone communications between TRAPPIER and LAMBUS on March 25, 2015, indicates that LAMBUS resupplied TRAPPIER with heroin once again on that date.   Specifically, on March 25, 2015, investigating agents intercepted the following telephone call between TRAPPIER and LAMBUS:

| | |
|---|---|
| TRAPPIER: | Yo! |
| LAMBUS: | What they saying now? |
| TRAPPIER: | Huh? |
| LAMBUS: | So what they saying now? |
| TRAPPIER: | Some people… they coming to buy it.   I got like five joints left. |
| LAMBUS: | All right, so how much you got left? |
| TRAPPIER: | Huh? |
| LAMBUS: | Huh? |
| TRAPPIER: | What you said? |
| LAMBUS: | What you got left? |
| TRAPPIER: | Like five. |
| LAMBUS: | Like five bonds? |
| TRAPPIER: | Yeah. |
| LAMBUS: | All right, I'm coming. |
| TRAPPIER: | Aight. |

Based on my training, experience and knowledge of this investigation, I believe that during the above-referenced exchange, LAMBUS asked TRAPPIER what customers of the DTO were saying about a brand of heroin the DTO was distributing (i.e., "What they saying now?"). TRAPPIER told LAMBUS that customers of the DTO were purchasing the heroin (i.e., "Some people . . . they coming to buy it"), and that TRAPPIER had 5 bundles of heroin remaining for distribution (i.e., "I got like five joints left").[5]   LAMBUS then asked again how much heroin TRAPPIER had in her possession to sell (i.e., "All right, so how much you got left?"), and TRAPPIER replied that she had five bundles remaining (i.e., "Like five").   LAMBUS then asked TRAPPIER to confirm that she had five bundles, which he referred to as "bonds," remaining (i.e., "Like five bonds?"), and TRAPPIER responded affirmatively (i.e., "Yeah"). LAMBUS then confirmed that he was heading to the area where TRAPPIER was located to supply her with additional heroin for distribution (i.e., "All right, I'm coming").

14.     At approximately 11:40 a.m. on March 25, 2015, TRAPPIER advised one of her customers named "Tommy" that she did not have any heroin available during the following intercepted telephone conversation:

| TRAPPIER: | Hello. |
| TOMMY: | What up Bob? |
| TRAPPIER: | I don't got nothing right now T. |
| TOMMY: | Alright. |

Based on my experience and knowledge of the investigation, I believe that during the

---

[5] Based on my training and experience, I know that a "sleeve" of heroin equals approximately 100 glassines of heroin.   90 glassines of heroin is equivalent to approximately 3 grams of heroin, which is an amount consistent with distribution, not personal use.

above-referenced telephone call when TRAPPIER told Tommy "I don't got nothing right now T," she was informing Tommy that she could not supply him with heroin because her supply had been depleted.   Approximately 37 minutes later, investigating agents intercepted another telephone call between TRAPPIER and one of her customers, during which TRAPPIER advised another customer that she needed to obtain more heroin before she could supply him with 5 glassines of heroin.   Specifically, on March 25, 2015 at approximately 12:17 p.m. TRAPPIER, who was using the 4421 TELEPHONE, had the following conversation with Simms:

|  |  |
|---|---|
| TRAPPIER: | Yo. |
| SIMMS: | You in the crib? |
| TRAPPIER: | Yeah, what do you want? |
| SIMMS: | Five shirts. |
| TRAPPIER: | Alright, you have to give me like half an hour. |
| SIMMS: | Alright. |

Based on my training, experience and knowledge of this investigation, I believe that during this telephone conversation Simms asked TRAPPIER if she was at the stash house located at 107-53 Watson Place (i.e., "You in the crib?").   TRAPPIER replied that she was at 107-53 Watson Place, and asked Simms how much heroin he wanted to purchase (i.e., "Yeah, what do you want?").   Simms replied that he wanted 5 glassines of heroin (i.e., "Five shirts").   TRAPPIER then told Simms that she would provide him with the 5 glassines of heroin, but needed approximately 30 minutes to get the heroin (i.e., "Alright, you have to give me like half an hour").

15.     Approximately 9 minutes after TRAPPIER told Simms that she would be resupplied with heroin within 30 minutes, investigating agents intercepted the following telephone call between LAMBUS and TRAPPIER:

| | |
|---|---|
| TRAPPIER: | Hello! |
| LAMBUS: | You ready before I get up out of this hood?   I'm about to leave. |
| TRAPPIER: | Yeah come on. |
| LAMBUS: | I'm outside. |
| TRAPPIER: | All right. |

Based on my training, experience and knowledge of this investigation, I believe that during this telephone call, LAMBUS and SHAVONA TRAPPIER coordinated a time at which LAMBUS would resupply TRAPPIER with heroin at 107-53 Watson Place.   Specifically, LAMBUS asked TRAPPIER if she was ready for him to deliver heroin to her (i.e., "You ready before I get up out of this hood?"), and told TRAPPIER that he was departing (i.e., "I'm about to leave"). TRAPPIER replied that she was ready for his arrival (i.e., "Yeah come on").   LAMBUS then stated that he was at TRAPPIER's location (i.e., "I'm outside"), and TRAPPIER stated that she understood (i.e., "All right").

16.     Investigating agents obtained location data for a global positioning monitoring device worn by LAMBUS on March 25, 2015.   Such data revealed that LAMBUS traveled from the vicinity of 173-00 107th Avenue, Jamaica, New York at 12:23 p.m. to the vicinity of 107-00 Watson Place, Jamaica, New York, which is in the vicinity of 107-53 Watson Place.   Moreover, this location data revealed that LAMBUS remained in the vicinity of 107-00 Watson Place from approximately 12:24 p.m. to 12:32 p.m.   Additionally, investigators

obtained video footage from a pole camera located in the vicinity of 107 Watson Place on March 25, 2015.   This video footage revealed the presence of a Grey Chrysler vehicle arrive in the vicinity of 107-53 Watson Place.   The video footage also depicts TRAPPIER exit the residence at 107-53 Watson Place at approximately 12:30 p.m., and re-enter the residence.   At approximately 12:31 p.m., the video footage depicts TRAPPIER once again exiting the residence at 107-53 Watson Place, and at 12:39 p.m. the video footage depicts TRAPPIER reenter the residence.   I believe that the above-described telephone calls, location data, and video footage demonstrates that LAMBUS arranged to resupply TRAPPIER with heroin on March 25, 2015, and that LAMBUS met TRAPPIER in the vicinity of 107-53 Watson Place between 12:24 p.m. and 12:32 p.m. and gave her the heroin.

17.   In addition to supplying TRAPPIER with narcotics to distribute on behalf of the DTO, LAMBUS facilitates the narcotics trafficking activities of the DTO by, among other things, obtaining samples of heroin from his suppliers, and selling heroin to distributors from his residence.   On May 16, 2015, investigating agents intercepted the following telephone call between LAMBUS and an unidentified female named "LIZZY":

| | |
|---|---|
| LIZZY: | K, it's Lizzy. |
| LAMBUS: | Yeah, what's up? |
| LIZZY: | He needs t[w]o sleeves. |
| LAMBUS: | Tell him to give me an hour because I am out right now. As a matter of fact, Imma have somebody coming to you right now. |
| LIZZY: | [ASIDE: Hey, he is gonna send somebody to you right now.] Aight. |
| LAMBUS: | I'm gonna send someone right now. |

Based on their training, experience and knowledge of the investigation, investigating agents believe that during the above-referenced telephone call, LAMBUS and LIZZY were arranging a narcotics transaction. LIZZY identified herself to LAMBUS (i.e., "K, it's Lizzy"), and asked an individual named "Ray" who appeared to be either near her or in contact with her via telephone to specify the type or quantity of narcotics he/she wanted to purchase ("[ASIDE: Ray (ph), what you want? (PAUSE) Two.]"). Thereafter, LIZZY told LAMBUS that Ray wanted to purchase two "sleeves" of heroin (i.e., "He needs to sleeves"). LAMBUS then told LIZZY that he needed an hour to obtain the heroin because he was preoccupied (i.e., "Tell him to give me an hour because I am out right now"), but then stated that he would send someone to LIZZY's location immediately to supply her with heroin (i.e., "As a matter of fact, Imma have somebody coming to you right now"). LIZZY then told Ray that LAMBUS was arranging for an associate to bring the heroin to him/her (i.e., "[ASIDE: Hey, he is gonna send somebody to you right now]") and confirmed that she understood (i.e., "Aight"). Thereafter, LAMBUS reiterated that he would send someone to deliver the requested heroin (i.e., "I'm gonna send someone right now").

     18.    On May 5, 2015, investigating agents intercepted a telephone call between LAMBUS, TRAPPIER, FULLER and FNU LNU, also known as "Pop," during which they discussed the quality of the "sweet dreams" and "first take" brands of heroin distributed by the DTO. During this telephone call, the following conversation ensued:

| | |
|---|---|
| POP: | You got me? |
| TRAPPIER: | Who this? |
| POP: | "P". |
| TRAPPIER: | Yeah, What's up man? |

POP:              What are you working with?

TRAPPIER:         I got the first take and the sweet bits.

POP:              Yeah , that sweet dreams, that is what I wanted to call you and tell you, tell this nigga "Don't fuck with that nigga that has the universal because that sweet dreams is garbage" Damn I should have called you a minute ago, and told you that shit. Fuck!

TRAPPIER:         Which one is garbage?

POP:              The sweet dreams

TRAPPIER:         It is?

POP:              Hell yeah man. I knew that I should have called you when I first got that shit because I had been getting the whole fucking thing. I have been getting 12 of them things, I have been getting seven from you and then I have been going to my other man because he has had the universal, so I have gone seven with you and five with him....

[VOICE OVERLAP]

TRAPPIER:         But I got the first pick though.

POP:              He hit with that sweet dreams shit, last week after I seen you, not last week, a couple of days ago and that shit is kill, garbage.

[VOICE OVERLAP]

TRAPPIER:         He right here...

POP:              Tell him not to fuck with universal.

TRAPPIER:         Hold on... He said that he did not hear that.

POP:              Put that nigga on the phone what is he scared to get on the phone.

[PHONE CHANGES HANDS]

LAMBUS:          Yo...

POP:             What up nigga?

LAMBUS:          Where you get that from that you're saying that?

POP:             What?

LAMBUS:          Sweet dreams.

POP:             That shit is garbage I had that shit a week ago and a half
                 ago; you know what I am saying.

[VOICE OVERLAP]

LAMBUS:          We did not have it for that long.

POP:             I know you did not have it, I have be going...I have been.

[VOICE OVERLAP]

LAMBUS:          That is a whole different person man.

[VOICE OVERLAP]

LAMBUS:          That is somebody else with another name, that is not us.

POP:             It is the same nigga that had the universal.

LAMBUS:          No it is not.

[VOICE OVERLAP]

POP:             It is the same niggas with the universal.

LAMBUS:          No it ain't. Universal and everything else is two different
                 people. What are you talking about?

POP:             I know it is two different people. I know that.

LAMBUS:          So how are you going to say that then?

POP:             I know first pick and universal is two different people
                 that's what I am trying to tell you. I was getting the
                 motherfucker first take from your nigga and then I was

going to my other nigga who had the universal and then he hit me up with sweet dreams, cause that what he fucks with, he fucks with the nigga with the universal, he hit me with that shit of the sweet dreams like a week ago. Both of them said that this shit is terrible[.] Both niggas who do it both ways saying that it is terrible.

LAMBUS:          Hold on I am about to put...

POP:             But I am saying I am getting the whole thing and you still aint hollering at your boy, what's good?

LAMBUS:          Huh?

POP:             You acting all funny with your boy.

LAMBUS:          How [a]m I acting funny, you over here telling me.... I am about to put you in the phone.

POP:             You can't see nigga no more.

LAMBUS:          I be too busy.

POP:             I am getting the whole thing and you can't see a nigga no more.

LAMBUS:          You getting it for the same price, you don't need to see me.

POP:             I rather see you though. What is the problem?

LAMBUS:          You don't need to see me if you are getting it the same price. Tell this person that...

[PHONE CHANGES HANDS]

POP:             Who this?

FULLER:          Wardy.

POP:             What is good?

[VOICE OVERLAP]

POP:             Why this nigga put you on the phone?

FULLER:               I don't know. He said that you're going to tell me
                      something.

POP:                  Put Bobby back on the phone.

FULLER:               Hold on.

[PHONE CHANGES HANDS]

LAMBUS:               Yo. Tell this person what you just told me about the sweet
                      dreams.

[VOICE OVERLAP]

POP:                  Who gives a fuck man.

LAMBUS:               I don't know what you're going to do.   What are you
                      going to do then?

POP:                  I am fucking with the first cake.

LAMBUS:               Alright then come get the first cake.

POP:                  That is what I am going to do.

LAMBUS:               Alright.

POP:                  I am talking to you… You don't want to give me your
                      number, what is that all that about?

LAMBUS:               Come get it then.

POP:                  Put Bobby on the phone. Yo give me your number what the
                      fuck is the problem.

[PHONE CHANGES HANDS]

TRAPPIER:             Yo.

POP:                  Yeah. Motherfucker I dont know why he is telling you to
                      give me his number, instead of him just giving it to me. I
                      don[']t know why...

TRAPPIER:             He is not going to give it to you!   What are you going to
                      do?

| | |
|---|---|
| POP: | Because he is not going to give it to me. |
| TRAPPIER: | Yeah. |
| POP: | If it was not for me that nigga would be losing mad bread. I am the one that tell them what to get and what not to get. |
| TRAPPIER: | Alright But you on my line.   You good? |
| POP: | I don't fuck nigga that are acting crazy. |
| TRAPPIER: | You good? |
| POP: | Yo[,] I need the first take ten of those. |
| TRAPPIER: | First take? |
| POP: | Yeah. |
| TRAPPIER: | What you want? |
| POP: | What you brother told you. |
| TRAPPIER: | Alright I am coming right now. |
| POP: | Mother fucker.   Give me ten minutes I am on my way home |
| TRAPPIER: | Alright. |

Based on my training, experience and knowledge of this investigation, I believe that during the above-referenced exchange, TRAPPIER, LAMBUS, and POP discussed the different brands of heroin distributed by the DTO, and POP asked TRAPPIER to supply him with a sleeve of heroin.   POP asked TRAPPIER to specify the type of heroin she had available for distribution (i.e., "What are you working with?"), and TRAPPIER replied that she had the "first take" brand heroin and the "sweet bits" brand of heroin available for distribution (i.e., "I got the first take and the sweet bits").   POP then told TRAPPIER that she should not purchase the brand of

heroin labeled "sweet dreams," because his customers did not like it (i.e., "Yeah, that sweet dreams, that is what I wanted to call you and tell you, tell this nigga [d]on't fuck with that nigga that has the universal because sweet dreams is garbage [d]amn I should have called you a minute ago, and told you that shit. Fuck!").   TRAPPIER then asked POP to specify the low-quality brand of heroin (i.e., "Which one is garbage"), and POP replied that the "sweet dreams" brand of heroin was poor quality (i.e., "The sweet dreams").   TRAPPIER then asked POP to confirm that the "sweet dreams" branded heroin was poor quality (i.e., "It is?").   POP replied that the "sweet dreams" brand of heroin was poor quality (i.e., "Hell[,] yeah man") and told TRAPPIER that he should have warned her about the "sweet dreams" brand of heroin after he received it from her the first time (i.e., "I knew that I should have called you when I first got that shit because I had been getting the whole fucking thing").   POP then stated that he had been purchasing twelve bundles of heroin daily – 7 of which were labeled "sweet dreams," which he received from TRAPPIER, and 5 of which were labeled "universal," which he received from another source of supply (i.e., "I have been getting 12 of them things, I have been getting seven from you and then I have been going to my other man because he has had the universal, so I have gone seven with you and five with him…."").   TRAPPIER stated that she only had the "first pick" brand of heroin in her possession, and therefore could not have been the source of the Sweet Dreams brand (i.e., "But I got the first pick though"), and POP said that his other heroin supplier recently gave him the "sweet dreams" brand of heroin, but his customers did not want it (i.e., "He hit with that sweet dreams shit, last week after I seen you, not last week, a couple of days ago and that shit is kill, garbage").   Thereafter, POP asked TRAPPIER to give the 4421 TELEPHONE to LAMBUS so that POP could speak with him (i.e., "Put that nigga on the phone what is he scared to get on the phone").

TRAPPIER then gave the 4421 TELEPHONE to LAMBUS, who began to converse with POP.  POP complained to LAMBUS about having to distribute the Sweet Dreams brand of heroin, describing it as "shit" (<u>i.e.</u>, "That shit is garbage I had that shit a week ago and a half ago; you know what I am saying").   Later, LAMBUS explained to POP that the "sweet dreams" brand of heroin did not come from LAMBUS, but another heroin supplier who was using the same label for his/her heroin (<u>i.e.</u>, "That is somebody else with another name, that is not us").   Thereafter, POP replied that the individual who sold him the "sweet dreams" brand of heroin was the same person who sold him the "universal" brand of heroin (<u>i.e.</u>, "It is the same nigga that had the universal").   LAMBUS told POP that the individual who distributed the "sweet dreams" brand of heroin was different than the individual who distributed the "universal" brand of heroin (<u>i.e.</u>, "No it ain[']t.   Universal and everything else is two different people.   What are you talking about?"), and POP stated that he understood (<u>i.e.</u>, "I know it is two different people.   I know that").   POP then explained that LAMBUS's associate had supplied him with the brand of heroin labeled "first pick" and another individual had supplied him with the brand of heroin labeled "universal" (<u>i.e.</u>, "I know first pick and universal is two different people that's what I am trying to tell you.   I was getting the motherfucker first take from your nigga and then I was going to my other nigga who had the universal").   POP then stated that the same individual who supplied him with the brand of heroin labeled "universal" also supplied him with the brand of heroin labeled "sweet dreams" (<u>i.e.</u>, "[H]e hit me up with sweet dreams, cause that what he fucks with …."), and that both LAMBUS's associate who supplied him with "first pick" and the individual who supplied him with "universal" and "sweet dreams" both told him that the "sweet dreams" brand of heroin was terrible (<u>i.e.</u>, "Both of them said that this shit is terrible[.]   Both niggas who do it both ways saying that it is terrible").

POP then complained that he does not obtain heroin directly from   LAMBUS anymore, but must communicate with LAMBUS through TRAPPIER (i.e., "But I am saying I am getting the whole thing and you still aint hollering at your boy, what's good?"; "You acting all funny with your boy"; "You can't see nigga no more").   LAMBUS replied by stating that he was too busy to meet with POP in person, and advis[ed] POP that he did not need to see LAMBUS in person because POP was receiving the heroin from TRAPPIER at the same price he would receive it from LAMBUS (i.e., "I be too busy"; "You getting it for the same price, you don't need to see me").

Thereafter, LAMBUS then gave the 4421 TELEPHONE to FULLER, who spoke to POP briefly and returned the 4421 TELEPHONE to LAMBUS, who resumed his conversation with POP.   POP then told LAMBUS that he would purchase an unspecified quantity of the "first cake" brand of heroin (i.e., "I am fucking with the first cake"), and LAMBUS told POP to come to his location to get the "first cake" brand of heroin (i.e., "Alright then come get the first cake").   POP replied that he intended to come to LAMBUS's location to get the "first cake" brand of heroin (i.e., "that is what I am going to do").   Thereafter, POP asked LAMBUS to provide him with LAMBUS's telephone number and asked to speak to TRAPPIER once again (i.e., "Put bobby on the phone.   Yo give me your number what the fuck is the problem").

POP then complained to TRAPPIER that LAMBUS would not provide him with his telephone number, but preferred for TRAPPIER to give him LAMBUS's telephone number (i.e., "Motherfucker I don't know why he is telling you to give me his number, instead of him just giving it to me").   POP then complained that he was responsible for recommending which brands of heroin the DTO should and should not purchase (i.e., "I am the one that tell them what

to get and what not to get").   Subsequently, POP asked TRAPPIER to supply him with ten bundles of the "first take" brand of heroin (i.e., "Yo I need the first take ten of those"). TRAPPIER then asked POP to confirm that he was requesting the "first take" brand of heroin (i.e., "First take?"), and told POP that she was heading to his location to deliver it (i.e., "Alright I am coming right now").

19.    As set forth below, investigating agents have seized heroin from customers of the DTO marked with the labels used to identify heroin distributed by the DTO. For example, on May 6, 2015, investigating agents seized 43 glassines of heroin labeled "sweet dreams" from ANDRE MITCHELL.[6]   On May 6, 2015, a law enforcement officer working in an undercover capacity purchased one sleeve of heroin from an individual named Lolita Grissom also bearing the label "sweet dreams."   Finally, on May 20, 2015, a confidential source ("CS") purchased one sleeve of heroin from TIHEEM CROCKER bearing the label "sweet dreams."

**STANLEY FULLER**

20.    The investigation has revealed that, like LAMBUS, FULLER is a high-level leader within the DTO, who distributes heroin to other mid-level leaders of the DTO. FULLER works closely with LAMBUS in supporting the narcotics trafficking activities of the DTO by, among other things, arranging to purchase heroin from the DTO's suppliers and ensuring that such heroin is tested for quality.   Intercepted telephone conversations between FULLER and LAMBUS further suggest that they make important decisions about the brands of

---

[6] At the time of MITCHELL's arrest, he possessed 4 cellular telephones, 31 rounds of .45-caliber ammunition and a bullet-proof vest.

heroin that the DTO purchases and distributes, such as the "Sweet Dreams," "Universal," "First Take," "Coca Cola" and "Pepsi" brands.

      21.    For example, on May 17, 2015, investigating agents intercepted the following conversation between FULLER, who was using the 6590 TELEPHONE, and LAMBUS, who was using the 6075 TELEPHONE, during which they discussed the quality of a brand of heroin sold to the DTO:

| | |
|---|---|
| FULLER: | Yo, so did anybody else check the thing? |
| LAMBUS: | I gave it like to six people when I was talking with you. |
| FULLER: | And what they said? |
| LAMBUS: | Said "oh that shit was good" as soon as, that's what I said, if they keep it the same, they don't fuck with it.   They don't try to put more then whatever they did right there. |
| FULLER: | Uh-uh. |
| LAMBUS: | Then, uh, we good money.   As soon as she [U/I] she' slike "I feel this already" so, you know what I'm saying? |
| FULLER: | Uh-uh. |
| LAMBUS: | So, as long as they don't try to, OD with the shit you know what I'm saying. |
| FULLER: | Right. |
| LAMBUS: | I don't know whatever they did.   What they do? |
| FULLER: | Nothing.   They put uh.. |
| [VOICES OVERLAP] | |
| LAMBUS: | That's what I'm saying. |
| FULLER: | They put, he said they put half and half.   Half of the good one and half of the Pepsi. |

| | |
|---|---|
| LAMBUS: | Oh well if he don't do more than that, then he should be good. |
| FULLER: | Uh-uh.   That's what it is. |
| LAMBUS: | If it doesn't get any more crazy that that right there, you should be good money and you get your money back right there. |

Based on my training, experience and knowledge of the investigation, I believe that during the above-referenced telephone call FULLER asked LAMBUS if anyone had tested the quality of narcotics FULLER gave to LAMBUS to distribute on behalf of the DTO (i.e., "Yo, so did anybody else check the thing?"), and LAMBUS replied that he gave the sample to 6 people for that purpose (i.e., "I gave it like to six people when I was talking with you").   FULLER asked what the testers said about the quality of the heroin (i.e., "And what they said?").   LAMBUS responded that the 6 testers said that the heroin "was good" (i.e., "Said 'oh that shit was good'").   LAMBUS also stated that one of the testers said that she could feel the effect of the heroin instantaneously (i.e., "As soon as she [U/I] she's like 'I feel this already'"), and FULLER stated that he understood (i.e., "Uh-uh").   LAMBUS then remarked that the testers performed their job well so long as they did not overdose on the heroin (i.e., "So, as long as they don't try to, OD with the shit you know what I'm saying").   Thereafter, FULLER told LAMBUS that FULLER's heroin suppliers told him that they created the mixture of heroin by combining two brands of heroin, one of which was the "Pepsi" brand of heroin (i.e., "They put, he said they put half and half.   Half of the good one and half of the Pepsi").   LAMBUS replied that so long as the supplier did not alter those proportions, the DTO should be able to sell the heroin (i.e., "Oh well if he don't do more than that, then he should be good").   FULLER agreed (i.e., "Uh-uh.   That's what it is").   LAMBUS then assured FULLER that if the supplier kept

supplying the DTO with the same heroin mixture, the DTO should be able to sell the heroin and pay back both the supplier and FULLER the amount due to them for supplying the heroin (i.e., "If it doesn't get any more crazy that that right there, you should be good money and you get your money back right there").

22.     On May 5, 2015, investigating agents intercepted a telephone call between LAMBUS and FULLER, during which LAMBUS and FULLER discussed the quality of the "Sweet Dreams" brand of heroin which FULLER gave to the DTO to distribute.   This telephone call, which is transcribed below, is an example of FULLER's involvement in furthering the goals of the DTO by supplying the DTO with heroin:

| | |
|---|---|
| LAMBUS: | Yo, I was about to say.   Man, what you use, what joint you use for that uh, that street game shit, mean that sweet doodoo whatever the fuck that is, sweet whatever the fuck that is? |
| FULLER: | You say, what?   The one I use? |
| LAMBUS: | Yeah. |
| FULLER: | The same one.   Why what happened? |
| LAMBUS: | They don't like that. |
| FULLER: | They don't like what? |
| LAMBUS: | That one.   That, uh, they say they don't like that shit. |
| FULLER: | Which one? |
| LAMBUS: | The, the sweet.   What it's called?   Sweet dreams? |
| FULLER: | Yeah. |
| LAMBUS: | They say they don't like that shit.   I mean, I ain't, Pop told me that when I put you on the phone, with the nigga, but he ain't say it, but, he said, he didn't like it but, uhm, I was talking to Ya, and Ya was like, he did it, I guess that's what |

Ya, you gave it to Ya, and he said, "Oh, was like I guess the coke were telling him he don't like that shit.

FULLER:    I don't know.   [U/I] I want my fucking money damn the fuck up.   I don't know what the fuck these niggas like and don't like.   I cant be part of this shit.   This shot got to go before I buy anything else.   Too many of them [j]oints.   I don't know.

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call LAMBUS asked FULLER what ingredients he used to create the "Sweet Dreams" brand of heroin (i.e., "Man, what you use, what joint you use for that uh, that street game shit, I mean that sweet doodoo whatever the fuck that is, sweet whatever the fuck that is"). FULLER then asked LAMBUS to confirm that he was referring to the "Sweet Dreams" brand of heroin that he distributed to the DTO (i.e., "You say what?   The one I use?"), and LAMBUS replied affirmatively (i.e., "Yeah").   FULLER then asked LAMBUS to specify the problem with the Sweet Dreams brand of heroin (i.e., "Why what happened?").   LAMBUS told FULLER that customers of the DTO did not like it (i.e., "They don't like that"; "That one. That, uh, they say they don't like that shit").   FULLER asked LAMBUS to specify which brand of heroin customers did not like (i.e., "Which one?"), and LAMBUS replied that they did not like the Sweet Dreams brand (i.e., "Sweet dreams?").   LAMBUS then explained that FNU LNU (also known as "POP") told him that he did not like the "Sweet Dreams" brand of heroin (i.e., "I mean, I aint, Pop told me that when I put you on the phone, with the nigga, but he aint say it, but, he said, he didn't like it"), and FNU LNU (also known as "Ya") informed him that customers did not like the Sweet Dreams brand of heroin (i.e., "you gave it to Ya, and he said 'Oh, was like I guess the coke were telling him he don[']t like that shit'").   FULLER then told LAMBUS that he wanted payment for the Sweet Dreams brand of heroin that he supplied to the

DTO irrespective of whether customers liked it (<u>i.e.</u> "I want my fucking money damn the fuck

up.   I don[']t know what the fuck these niggas like and don't like.   I cant be part of this shit").

FULLER also told LAMBUS that the DTO needed to sell the Sweet Dreams brand of heroin

before he would obtain more heroin from his suppliers to give to the DTO (<u>i.e.</u>, "This shit got to

go before I buy anything else.   Too many of them Joints.   I don't know").

      23.     Later, on May 5, 2015 at 9:56 p.m., LAMBUS and FULLER continued to

discuss their heroin trafficking operations.   Specifically, investigating agents intercepted the

following telephone conversation during which LAMBUS described the feedback he was

receiving from his distributors about the "Sweet Dreams" and "First Take" brands of heroin he

received from FULLER for distribution:

| | |
|---|---|
| FULLER: | What?   Yeah, who the hell did you, did you put me on the phone with? |
| LAMBUS: | What? |
| FULLER: | Who you put me on the phone with? |
| LAMBUS: | Oh, this nigga Pop. |
| FULLER: | Who the fuck is that? |
| LAMBUS: | Somebody, I mean, somebody, he be coming to buy but I just wanted, I just wanted you to hear what he was saying. Like, he was saying he'd rather, I'm like, yo, he was like, yo, because she wanted to give him something different. So, I'm like, "here take this shit.   Give him the sweet dreams."   He went, "Nah, I had that shit already.   That shit is garbage.   I rather just take the first take, whatever the fuck."   I was like alright. |
| FULLER: | The ones, the[m] ones you had is from your man from Brooklyn. |
| LAMBUS: | What, the, the, the sweet dreams? |

FULLER:          Yeah, sweet dreams.   The first [U/I].

LAMBUS:          Oh, and then the other ones.

FULLER:          Both of them.

LAMBUS:          And the ones that Ya has is from who?

FULLER:          The one that Ya had is your man from Brooklyn.   The large 400 I had.

LAMBUS:          Oh.

FULLER:          [U/I] The ones with the spider web.

LAMBUS:          Alright.

FULLER:          I don't, I don't understand.

LAMBUS:          So you didn't put nothing else before in them?

FULLER:          No.

LAMBUS:          Alright, well, before you do anything, you gotta get word from the street with that shit… before you go [U/I] on that shit.   Or anything, you need to get word back because, that's the, whatever the, whatever they, they not saying nothing about first take.   Only like a few, like, Yo, I'd rather have first, I'd rather something different than first take.   Not even a lot.   Know what I'm saying?   [U/I] told me that.   And Old Go [U/I] people telling him that they talking about they don't like the sweet dream shit.

FULLER:          I don't understand.   I don't get it.   You know what I mean?

LAMBUS:          I don't get neither.   When we give the samples out they saying this shit is crazy.   Unless these niggas are doing something, unless these niggas are doing something to their shit, other than that, man, I don't see what the problem, I don't understand.

FULLER:          They will not do nothing to it.   They don't get, gain nothing out of doing nothing.   Get it? [U/I].

| | |
|---|---|
| LAMBUS: | Did you fuck with the cut? |
| FULLER: | No. |
| LAMBUS: | I don't know what the problem is.   I can't even call it.   I don't know what the problem is.   I just now gave somebody the uh, the uh, the sweet dreams.   I didn't wanna give nobody else and they started asking for it.   And all we had was 200 of it.   So, I didn't get no answers back from here and I don't even known how Pop got it because he never, he's talking about he got it from some, uh, from the same people that had Universal.   I'm like, "That's two different peoples." |
| FULLER: | Somebody, I don't know where he got it from.   [U/I]. |
| LAMBUS: | Yeah, he saying he got that from, he got that from [U/I] I'm like, "That's two…"   He's like, "Yeah, I know," I'm like, "Then you ain't get that."   He's like, "Somebody cross town had that."   I'm like then there's somebody with the same name but not the same shit."   So, we'll see what happens. |
| FULLER: | Same shit. |
| LAMBUS: | As a matter of fact.   Bobby gave somebody this shit so I'm gonna call her now and see what they said about the sweet dream shit.   You heard? |
| FULLER: | Mmhmm. |
| LAMBUS: | I'll call you right back. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call LAMBUS told FULLER that he put FULLER on the telephone with FNU LNU, also known as "POP" (i.e., "Who you put me on the phone with[?]"; "Oh, this nigga Pop"). FULLER asked LAMBUS to identify POP (i.e., "Who the fuck is that?"), and LAMBUS explained that POP was a heroin distributor who had information LAMBUS wanted to communicate to FULLER about the quality of the heroin FULLER was supplying to the DTO

(i.e., "Somebody, I mean, somebody, he be coming to buy but I just wanted, I just wanted you to hear what he was saying").   LAMBUS then advised FULLER that he offered to supply POP with the Sweet Dreams brand of heroin, but POP refused to purchase it due to concerns about its quality, and instead asked to purchase the First Take brand of heroin (i.e., "So, I'm like, 'Here take this shit.   Give him the sweet dreams"   He went, "Nah, I had that shit already.   That shit is garbage.   I rather just take the first take, whatever the fuck.'   I was like alright").   FULLER then asked if LAMBUS had obtained the Sweet Dreams brand of heroin from a source of supply in Brooklyn (i.e., "The ones, then ones that you had is from your man Brooklyn"), and LAMBUS asked if FULLER was referring to the Sweet Dreams brand (i.e., "What, the, the, the, sweet dreams?").   FULLER responded affirmatively (i.e., "Yeah, the sweet dreams").   LAMBUS then told FULLER that he was referring to the Sweet Dreams brand of heroin he obtained from Brooklyn, as well as another brand of heroin (i.e., "Oh, and then the other ones").   LAMBUS then asked FULLER where the heroin Ya was distributing originated (i.e., "And the ones that Ya has is from who?"), and FULLER replied that the brand of heroin Ya was distributing was given to FULLER from a source in Brooklyn (i.e., "The one that Ya had is your man from Brooklyn").   FULLER also told LAMBUS that he had received approximately 400 sleeves (1.2 kilograms) of the brand of heroin Ya was distributing from the source of supply in Brooklyn (i.e., "The large 400 I had"), and that the brand of heroin Ya was distributing was marked with an image of a spider web (i.e., "The ones with the spider web").

Thereafter, LAMBUS told FULLER that most customers had no complaints about the First Take brand of heroin, with the exception of a few who claimed they would rather have a different brand of heroin than First Take (i.e., "they not saying nothing about the first take.   Only like a few, like, Yo, I'd rather have first, I'd rather have something different than

first take"). LAMBUS also told FULLER that an unidentified individual named "Old Go" said that customers were informing him that they didn't like the Sweet Dreams brand of heroin (i.e., "And Old Go [U/I] people telling him that they talking about they don't like the sweet dream shit"). FULLER then told LAMBUS that he didn't understand why customers did not like the Sweet Dreams and First Take brands of heroin (i.e., "I don't understand.   I don't get it. You know what I mean?"). LAMBUS replied that he also did not understand (i.e., "I don't get neither"). LAMBUS then complained that he and FULLER distributed samples of Sweet Dreams and First Take brands of heroin and received positive feedback (i.e., "When we give the samples out they saying this shit is crazy"). LAMBUS then complained that unless members of his distribution network were altering the composition of the heroin, it should be acceptable to the DTO's customer base (i.e., "Unless these niggas are doing something, unless these niggas are doing something, unless these niggas are doing something to their shit, other than that, man, I don't see what the problem"). FULLER assured LAMBUS that their distributors would not alter the composition of the heroin because they would not profit from doing so (i.e., "They will not do nothing to it.   They don't get, gain nothing out of doing nothing.   Get it? [U/I]"). LAMBUS then asked FULLER if he had diluted the heroin (i.e., "Did you fuck with the cut?"), and FULLER stated that he had not (i.e., "No"). LAMBUS then told FULLER that he had recently supplied someone with the Sweet Dreams brand of heroin, and although he did not want to continue distributing it, his distributors were asking for it (i.e., "I just now gave somebody the uh, the uh, the sweet dreams.   I didn't wanna give nobody else and they started asking for it"). LAMBUS then told FULLER that he had approximately 200 sleeves of the Sweet Dreams brand of heroin to sell (i.e., "And all we had was 200 of it").

LAMBUS also stated that he did not know how POP obtained the Sweet Dreams brand of heroin, because POP advised him that he obtained the Sweet Dreams brand of heroin from the same source that supplied him with the Universal brand of heroin (i.e., "I don't even know how Pop got it because he never, he's talking about he got it from some, uh, from the same people that had Universal").   FULLER then stated that he did not know where POP obtained the Sweet Dreams brand of heroin (i.e., "Somebody, I don't know where he got it from"). LAMBUS replied that POP told him that he had obtained the Sweet Dreams brand of heroin from someone "cross town," and that it is possible that POP was supplied with the Sweet Dreams by a source other than the DTO (i.e., "I'm like then there's somebody with the same name but not the same shit").   FULLER then stated that he believed that the Sweet Dreams brand of heroin POP was distributing was the same brand of heroin that LAMBUS was distributing to the DTO (i.e., "Same shit").    LAMBUS then said that TRAPPIER sold the Sweet Dreams brand of heroin, so he would call her to find out if the customer she sold it to was satisfied with it (i.e., "Bobby gave somebody this shit so I'm gonna call her right now and see what they said about the sweet dream shit").

       24.    Immediately after LAMBUS and FULLER had the above-referenced conversation, LAMBUS called TRAPPIER to solicit information regarding what her customers thought about the quality of the sweet dreams brand of heroin:

| | |
|---|---|
| TRAPPIER: | Yo. |
| LAMBUS: | So, what he say about that? |
| TRAPPIER: | That they like it way better. |
| LAMBUS: | Huh? |
| TRAPPIER: | It's a go. |

| LAMBUS: | It's a go? |
| TRAPPIER: | Yeah. |
| LAMBUS: | Who you gave it to? |
| TRAPPIER: | My peoples. |
| LAMBUS: | You ain't give none to Pop? |
| TRAPPIER: | Nah, he didn't want it. |
| LAMBUS: | 'Cause Pop was [U/I] he never had it. |
| TRAPPIER: | I said, I said, I see him tomorrow, [U/I] 'cause I didn't go see him.  Shakeem had went whatever to the guy [U/I], I had to throw him a shirt or something but he still bought a, he bought a whole thing of the other one. [U/I] |
| LAMBUS: | Alright. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call LAMBUS asked TRAPPIER to report what customers of the DTO said about the quality of the Sweet Dreams brand of heroin (i.e., "So, what he say about that?"), and TRAPPIER stated that her customers liked it (i.e., "That they like it way better").   Thereafter, LAMBUS asked TRAPPIER to specify who she gave it to (i.e., "Who you gave it to?"), and TRAPPIER replied that she gave it to her customers and/or distributors (i.e., "My peoples"). LAMBUS then asked if TRAPPIER gave any of the heroin to POP (i.e., "You ain't give none to Pop?"), and TRAPPIER stated that she had not because POP did not want the Sweet Dreams brand of heroin (i.e., "Nah, he didn't want it").   LAMBUS stated that POP never had the Sweet Dreams brand of heroin (i.e., " 'Cause Pop was [U/I] he never had it"), and TRAPPIER said that she would see Pop on May 6, 2015 (i.e., "I said, I said, I see him tomorrow").   TRAPPIER also stated that POWELL recently sold POP heroin, and that POP purchased a sleeve of a different

brand of heroin from POWELL (i.e., "Shakeem had went whatever to the guy[U/I], I had to throw him a shirt or something but he still bought a, he bought a whole thing of the other one").

### SHAVONA TRAPPIER

25.     As explained above, SHAVONA TRAPPIER, POWELL, TROTTER and FNU LNU (also known as "Chris") each use telephone number (347) 878-4421 (the "4421 TELEPHONE") to distribute heroin on behalf of the DTO.   Specifically, intercepted telephone calls, physical surveillance, and evidence obtained during arrests have demonstrated that TRAPPIER, POWELL, TROTTER and FNU LNU, also known as "Chris" distribute the "Sweet Dreams," "Coca Cola," "First Take," "Universal," and "King Kong" brands of heroin from a stash house located at 107-53 Watson Place in Queens, New York.

26.     For example, on February 24, 2015 at approximately 9:33 p.m., investigating agents intercepted the following telephone call between TRAPPIER, who was using the 4421 TELEPHONE, and Simms, during which the following telephone conversation ensued:

| TRAPPIER: | What's up? |
|---|---|
| SIMMS: | What's [u]p.   Yo, I am coming th[r]ough for one whole outfit, alright? |
| TRAPPIER: | Alright[.] |
| SIMMS: | You said you got Coke-Cola? |
| TRAPPIER: | Yeah[.] |
| SIMMS: | Alright, that's what I want[.] |
| TRAPPIER: | Yeah[.] |
| SIMMS: | Give me like fifteen minutes alright, please don't go no where, I am coming, alright? |

TRAPPIER:          [A]lright[.]

Based on my training, experience and knowledge of the investigation, I believe that during this telephone conversation, TRAPPIER arranged to sell Simms heroin.   In particular, Simms told TRAPPIER that he wanted to purchase what he called "one whole outfit" of heroin (i.e., "Yo, I am coming th[r]ough for one whole outfit, alright?"), and TRAPPIER stated that she understood (i.e., "Alright").   Simms then asked TRAPPIER if she had the brand of heroin labeled "Coca Cola" (i.e., "You said you got Coke-Cola?"), and TRAPPIER stated that she did (i.e., "Yeah").   Simms then told TRAPPIER that he wanted the Coca Cola brand of heroin (i.e., "Alright, that's what I want"), and informed TRAPPIER that he would arrive at her location in approximately 15 minutes (i.e., "Give me like fifteen minutes alright, please don't go no where, I am coming, alright?").

27.   At approximately 9:46 p.m., law enforcement officers performing surveillance in the vicinity of Watson Place in Queens, New York observed a 2008 Mercedes with New York license plate number GDT1844 travel westbound on Polhemus Avenue and then turn southbound on Watson Place.   The vehicle remained in the vicinity of Watson Place for approximately 10 minutes.[7]

28.   At approximately 9:48 p.m., investigating agents intercepted the following telephone call between TRAPPIER, who was using the 4421 TELEPHONE, and Simms:

TRAPPIER:          Yo.

---

[7] Watson Place is a dead-end street.

SIMMS:              I am here.

TRAPPIER:           Alright, I am coming right now.[8]

29.     Shortly after investigating agents intercepted this telephone call, law enforcement officers performing surveillance observed the 2008 Mercedes vehicle depart from the vicinity of Watson Place and drive towards 177th Street and 106th Avenue.   While the officers were observing the vehicle, the vehicle failed to use the proper signal prior to making a left turn onto Liberty Avenue.   Shortly thereafter officers stopped the vehicle.   The driver of the vehicle identified himself at Donald Howard, and the passenger identified himself as Simms.   During the traffic stop, one of the officers observed in plain view 3 glassines of heroin bearing the stamp "Coca Cola" on the passenger side floor of the vehicle.   The officers then placed Simms and Howard under arrest.   Officers later discovered 7 glassines of heroin stamped with the mark "Coca Cola" in Simms's right sock.

30.     On March 4, 2015, investigating agents also intercepted a telephone call between TRAPPIER, who was using the 4421 TELEPHONE, and an unidentified male ("UM#1"), during which TRAPPIER arranged to sell UM#1 a sleeve of heroin:

TRAPPIER:           Hello.

UM#1:               I'm on my way right now.

TRAPPIER:           What you want?

UM#1:               I want the sleeve.

TRAPPIER:           Alright.

UM#1:               I'll be there in five, twenty-fifteen minutes.

---

[8] Investigating agents intercepted this statement by TRAPPIER at approximately 9:52 p.m.

| | |
|---|---|
| TRAPPIER: | Okay. |
| UM#1: | Where you want me to meet you at? |
| TRAPPIER: | Just come. |
| UM#1: | Come to the crib? |
| TRAPPIER: | Yeah. |

Based on my experience and knowledge of the investigation, I believe that during this telephone call, TRAPPIER arranged to sell UM#1 a sleeve of heroin.  TRAPPIER asked UM#1 to specify the amount of heroin he was requesting (i.e., "What you want?"), and UM#1 stated that he wanted to purchase a sleeve of heroin (i.e., "I want the sleeve").   Subsequently, UM#1 told TRAPPIER that he would arrive in approximately 15 to 20 minutes (i.e., "I'll be there in five, twenty-fifteen minutes"), and asked TRAPPIER if she wanted him to meet her at TRAPPIER's residence (i.e., "Where you want me to meet you at?"; "Come to the crib?"). TRAPPIER instructed UM#1 to meet her at her residence (i.e., "Yeah").

31.    Finally, on May 22, 2015, investigating agents intercepted the following telephone call between TRAPPIER, who was using the 4421 TELEPHONE, and an unidentified male ("UM#2"), during which TRAPPIER arranged to sell UM#2 a sleeve of heroin:

| | |
|---|---|
| UM#2: | I'm heading to you right now, I want a whole sleeve and a one t-shirt. |
| TRAPPIER: | Alright. |
| UM#2: | I'll cal[l] you when [I] get over there. |
| TRAPPIER: | [A]lright. |
| UM#2: | Bye.[] |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call, UM#2 told TRAPPIER that he wanted to purchase a sleeve (100 glassines) and a glassine of heroin.   Specifically, UM#2 told TRAPPIER that he was headed to her location and wanted to purchase a sleeve and a glassine of heroin (i.e., "I'm heading to you right now, I want a whole sleeve and a one t-shirt").   TRAPPIER stated that she understood (i.e., "Alright"). UM#2 then told TRAPPIER that he would call her when he arrived at her location (i.e., "I'll cal[l] you when [I] get over there"), and TRAPPIER stated that she understood (i.e., "Alright").

**SHAKEEM POWELL**

      32.    As noted, POWELL also uses the 4421 TELEPHONE to distribute heroin on behalf of the DTO.  For example, on February 18, 2015 at approximately 3:14 p.m., investigating agents intercepted the following telephone call between POWELL, who was using the 4421 TELEPHONE, and an unidentified male who was subsequently identified as Nevolger Hardy, during which POWELL arranged to sell Hardy the brand of heroin labeled "King Kong" on behalf of the DTO:

| | |
|---|---|
| POWELL: | What happened? |
| HARDY: | It's [U/I] yo. |
| POWELL: | I know that nigga, what up? |
| HARDY: | Yeah, you in the hood? |
| POWELL: | Yeah. |
| HARDY: | You not driving right? |
| POWELL: | I don't know.   Sort of not….   I don't know. |
| HARDY: | You don't know? |
| POWELL: | I'm not driving, I'm not driving. |

| HARDY: | Alright, I gotta get in and out the hood.   I'mma shot over there.   I'mma jump on the [U/I]. |
| POWELL: | Alright. |
| HARDY: | Alright, Sha, Sha I gotta be in and out man. |
| POWELL: | How much do you want? |
| HARDY: | I'm on my way over there now, alright? |
| POWELL: | What you want? |
| HARDY: | I'm coming right, just a couple of joints. |
| POWELL: | Alright. |
| HARDY: | Alright, later. |

Based on my training, experience and knowledge of the investigation, I believe that during this conversation, POWELL and Hardy were arranging a narcotics transaction.   Specifically, Hardy asked POWELL if he was in the vicinity of 107-53 Watson Place (i.e., "Yeah, you in the hood?"), and POWELL stated that he was (i.e., "Yeah").   Later, Hardy told POWELL that he would travel to POWELL's location to purchase heroin (i.e., "Alright, I gotta get in and out the hood.   I'mma shot over there.   I'mma jump on the [U/I]"), and POWELL asked Hardy to specify the quantity of heroin he was requesting (i.e., "How much do you want?").   Hardy replied that he wanted "a couple of joints" of heroin (i.e., "I'm coming right, just a couple of joints"), and POWELL stated that he understood (i.e., "alright").

33.   At approximately 3:46 p.m., investigating agents intercepted the following telephone conversation between Hardy, and POWELL, who was using the 4421 TELEPHONE, during which they arranged to meet at a location they described as "the park" to consummate the heroin transaction:

| | |
|---|---|
| HARDY: | Yeah. |
| POWELL: | Where you at? |
| HARDY: | I'm at the park on 171 and 104…. Oh 172 my bad. |
| POWELL: | So stay right there, stay right there, I'm coming right now, stay right there. |
| HARDY: | I'm on the other side of the park. |
| POWELL: | I'm on the other side of the Park, I'm off the block from you. |
| HARDY: | Oh, okay. |
| POWELL: | Walk up the middle of the block towards 171. |
| HARDY: | Alright. |

34.    At approximately 3:30 p.m. on February 18, 2015, investigating agents performing surveillance observed POWELL in the vicinity of 171st Street and 107th Avenue. At approximately 3:45 p.m., officers observed POWELL speaking to a male in the middle of 104th Avenue near 172nd Street.   At approximately 3:50 p.m., officers stopped Hardy.   Upon stopping Hardy, officers discovered one glassine of heroin in his possession bearing the stamp "King Kong."   Following his arrest, Hardy told law enforcement officers that he had purchased the heroin from an individual he referred to as "Sha.

35.    In addition to the heroin transaction described above, numerous telephone communications between POWELL and others reveal that POWELL distributes heroin to other distributors on behalf of the DTO.  For example, on May 27, 2015, investigating agents intercepted the following telephone conversation, during which POWELL, who was using the 4421 TELEPHONE, arranged to sell the "Sweet Dreams" brand of heroin to an unidentified male ("UM#3"):

| | |
|---|---|
| UM#3: | You ready? |
| POWELL: | Yeah. |
| UM#3: | Let[']s make it happen[]. |
| POWELL: | [A]lright, what you want[], ten? |
| UM#3: | Yeah.   What you working with? |
| POWELL: | I have that sweet dream shit. |
| UM#3: | That is it? |
| POWELL: | Fresh batch, I just got this shit. |
| UM#3: | Please, please. |
| POWELL: | Alright I am coming right now. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call, POWELL was arranging to sell the Sweet Dreams brand of heroin to UM#3. Specifically, UM#3 asked POWELL if he was ready to conduct a narcotics transaction (i.e., "You ready?"), and POWELL replied affirmatively (i.e., "Yeah").   UM#3 then confirmed that he intended to conduct such a transaction (i.e., "Lets make it happen[]").   POWELL asked UM#3 if he wanted 10 bundles of heroin (i.e., "alright, what you want[], ten?"), and UM#3 told POWELL that he wanted 10 bundles of heroin and asked POWELL what brand of heroin he had available (i.e., "Yeah.   What you working with?").   POWELL replied that he had recently obtained the Sweet Dreams brand of heroin (i.e., "I have that sweet dream shit"; "Fresh batch, I just got this shit").   UM#3 then asked POWELL to supply him with the heroin (i.e., "Please, please"), and POWELL stated that he would come to UM#3's location to deliver the heroin (i.e., "Alright I am coming right now").

36.     On April 29, 2015, investigating agents also intercepted a telephone call between POWELL, who was using the 4421 TELEPHONE, and an unidentified male ("UM#4"), during which POWELL agreed to sell UM#4 the "First Take" brand of heroin. During this telephone call, the following conversation ensued:

| | |
|---|---|
| UM#4: | You have that f[l]avored drink…   Coke-Cola[?] |
| POWELL: | Nah I have the other shit. |
| UM#4: | What is the name? |
| POWELL: | [F]ast take or first take some shit like that. |
| UM#4: | How is it? [unintelligible] |
| POWELL: | Yeah it is good. |
| UM#4: | I did see you go down 106.   Where you at? |
| POWELL: | You have to meet me somewhere it is too hot.   [M]eet me on 171 and 105 across the park. |
| UM#4: | Damn you driving I am walking. |
| POWELL: | I am not trying to do anything over there it is hot. |
| UM#4: | Alright. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call UM#4 asked POWELL if he had the "Coca Cola" brand of heroin available for sale (i.e., "You have that f[l]avored drink…   Coke-Cola[?]").   POWELL replied that he did not have the Coca Cola brand of heroin available, but instead had the "First Take" brand of heroin available for sale (i.e., "Nah I have the other shit"; "[F]ast take or first take some shit like that").   UM#4 then asked POWELL to describe the quality of the First Take brand of heroin (i.e., "How is it?"), and POWELL replied that the quality was good (i.e., "Yeah it is good").

Subsequently POWELL directed UM#4 to meet him in the vicinity of 171st Street and 105th Avenue near a park (i.e., "meet me on 171 and 105 across the park"), and UM#4 stated that he would do so (i.e., "Alright").

37.     Finally, on or about June 10, 2015, POWELL was arrested while selling heroin on behalf of the DTO.   In particular, on June 10, 2015, law enforcement officers who were conducting surveillance in the vicinity of the northeast section of 172 Street and 104th Avenue, Queens, New York observed POWELL seated in the driver's seat of a 2014 Chrysler vehicle, with Alabama license plate number 54AD561.   The officers observed an individual approach the driver's side window of the vehicle, and hand POWELL a quantity of United States currency.   The officers then observed POWELL hand the individual a white object through the driver's side window, and the individual place the white object into his front right pants pocket.   Officers subsequently arrested both POWELL and the other individual.   Upon arresting the individual who was in the vehicle with POWELL, the officers searched the individual's front right pants pocket and discovered one white glassine envelope containing a quantity of heroin.   The officers searched POWELL and recovered 8 glassine envelopes containing heroin from the vicinity of POWELL's groin.   The officers also found $23 in the driver's side of the vehicle driven by POWELL.   The 8 glassines of heroin in POWELL's possession were marked with a stamp bearing the mark "Sweet Dreams."

**TYRAN TROTTER**

38.     The evidence obtained during this investigation has revealed that TROTTER recently began distributing heroin on behalf of the DTO using the 4421 TELEPHONE from 107-53 Watson Place.   For example, on June 13, 2015, investigating

agents intercepted a telephone call between TROTTER, who was using the 4421 TELEPHONE, and MICHAEL SCOTT:

| | |
|---|---|
| SCOTT: | I need to come and see you. |
| TROTTER: | Come to the crib. |
| SCOTT: | Alright, I need three full ones. |
| TROTTER: | Say that again. |
| SCOTT: | Three bunny rabbits. |
| TROTTER: | Alright, come to the crib. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call SCOTT told TROTTER that he needed to visit him to obtain heroin (i.e., "I need to come and see you"), and TROTTER replied that SCOTT could meet him at 107-53 Watson Place (i.e., "Come to the crib").   SCOTT then told TROTTER that he needed 3 bundles of heroin, which he called "three full ones" (i.e., "Alright, I need three full ones"; "Three bunny rabbits").   Thereafter, TROTTER told SCOTT to go to 107-53 Watson Place to purchase the heroin (i.e., "Alright, come to the crib").

39.    On June 13, 2015, investigating agents intercepted the following telephone call between TROTTER, who was using the 4421 TELEPHONE, and an unidentified male ("UM#5"), during which TROTTER arranged to sell UM#5 2 bundles of heroin from 107-53 Watson Place:

| | |
|---|---|
| UM#5: | Where you at? |
| TROTTER: | What you want? |
| UM#5: | Second floor. |
| TROTTER: | Two bombs? |

| UM#5: | The dog food. |
|---|---|
| TROTTER: | My man can you hear?   Two bombs or two shirts? |
| UM#5: | Two shirts. |
| TROTTER: | You going to have to wait an hour.   Somebody is going to come for the rest. |
| UM#5: | You know what give me the one whole bomb. |
| TROTTER: | Alright. |
| UM#5: | Where you at? |
| TROTTER: | Come to the crib. |

Based on their training, experience and knowledge of the investigation, investigating agents believe that during this exchange, TROTTER asked UM#5 if he wanted to purchase two bundles of heroin (i.e., "Two bombs?").   UM#5 then clarified that he was requesting heroin, using the term "dog food" as code for heroin.   TROTTER then asked UM#5 whether he wanted to purchase 2 bundles or 2 glassines of heroin (i.e., "Two bombs or two shirts?"), and UM#5 replied that he wanted 2 glassines of heroin (i.e., "two shirts").   Thereafter, UM#5 told TROTTER that he wanted to purchase 1 bundle of heroin (i.e., "you know what give me one whole bomb"), and TROTTER told him that he would do so (i.e., "Alright").   UM#5 then asked TROTTER where he was located (i.e., "Where you at?"), and TROTTER directed UM#5 to come to 107-53 Watson place to complete the transaction (i.e., "Come to the crib").

**FNU LNU, also known as "Chris"**

40.    The investigation has revealed that, like TRAPPIER, POWELL and TROTTER, FNU LNU, also known as "Chris," distributes narcotics on behalf of the DTO using the 4421 TELEPHONE.   For example, on April 3, 2015, investigating agents intercepted

the following telephone call between CHRIS, who was using the 4421 TELEPHONE, and

TRAPPIER:

| | | |
|---|---|---|
| TRAPPIER: | Yeah. | |
| CHRIS: | You on the road? | |
| TRAPPIER: | Why? | |
| CHRIS: | Nah I'm just [U/I] ready. | |
| TRAPPIER: | Oh. | |
| CHRIS: | I need something else. | |
| TRAPPIER: | You finished everything[?] | |
| CHRIS: | I don't have nothing to compute with anybody right now. | |
| TRAPPIER: | What you got left? | |
| CHRIS: | Four three. | |
| TRAPPIER: | Four three what? | |
| CHRIS: | Three four shirts. | |
| TRAPPIER: | Shirts? | |
| CHRIS: | Yeah. | |
| TRAPPIER: | Somebody called you or no? | |
| CHRIS: | Yeah.   Its D, you know he's a regular. | |
| TRAPPIER: | What he wanted? | |
| CHRIS: | The regular one whole shit. | |
| TRAPPIER: | Alright, um, I'm going to have [U/I] give it to you. | |
| CHRIS: | Alright.   I don't even know if that nigga in the crib, tell that nigga to hurry up and get to the crib. | |

TRAPPIER:          I'm going to call him.   Oh shit Tommy called me though.

CHRIS:             Alright.

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call CHRIS asked TRAPPIER to supply him with heroin to sell to another distributor within the DTO.  Specifically, CHRIS told TRAPPIER that he needed heroin (i.e., "I need something"), and TRAPPIER asked CHRIS if he had already distributed all of the heroin in his possession (i.e., "You finished everything[?]").   Thereafter, TRAPPIER asked CHRIS to specify how much heroin he had remaining (i.e., "What you got left?"), and CHRIS stated that he had three or four unspecified units of heroin remaining (i.e., "Four three").   TRAPPIER then asked CHRIS to specify the units he was referring to (i.e., "Four three what?"), and CHRIS stated that he had three or four glassines of heroin (i.e., "Three four shirts").   Thereafter, TRAPPIER asked CHRIS if a distributor called him and asked to be resupplied (i.e., "Somebody called you or no?"), and CHRIS replied that an individual named "D," who regularly purchased narcotics from the DTO, had called him (i.e., "Yeah.   Its D, you know he's a regular").   TRAPPIER then asked CHRIS to specify the quantity of heroin D had requested (i.e., "What he wanted?").   CHRIS replied that D requested a sleeve of heroin (i.e., "The regular one whole shit").   TRAPPIER then told CHRIS that she would ensure that someone gave CHRIS the amount of heroin necessary to meet D's request (i.e., "Alright, um, I'm going to have [U/I] give it to you").   CHRIS asked TRAPPIER to urge the individual transporting the heroin to come to his location quickly (i.e., "Alright.   I don't even know if that nigga in the crib, tell that nigga to hurry up and get to the crib").

41.    On March 13, 2015, investigating agents also intercepted a telephone call between CHRIS, who was using the 4421 TELEPHONE, and TRAPPIER, during which CHRIS reported his narcotics distribution activities to TRAPPIER:

| | |
|---|---|
| CHRIS: | Yo.  Yo. |
| TRAPPIER: | Yo. |
| CHRIS: | What-up? |
| TRAPPIER: | Ain't nothing, are you done with that shit? |
| CHRIS: | Say again? |
| TRAPPIER: | I said are you almost finished with that shit? |
| CHRIS: | Damn near, I am going to have to go back and get two whole ones for [U/I] because he just now making it [PAUSE] and motherfucker Q came and he only wanted seven, I only had four so I gave what I had, the four for, um, two eighty right? |
| TRAPPIER: | Uh…. yeah. |
| CHRIS: | Yeah right? |
| TRAPPIER: | Yeah. |
| CHRIS: | I was just making sure.   Alright.   So um… hold on. |
| TRAPPIER: | What you got is what is left.   I need to get more, that's I am asking your if you're finished. |
| CHRIS: | Okay so as soon as I am done I going to give it to Sha? |
| TRAPPIER: | Uh-yeah. |
| CHRIS: | Okay. |
| TRAPPIER: | Alright. |
| CHRIS: | Alright. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call CHRIS was reporting the status of his inventory of heroin to TRAPPIER.   In particular, TRAPPIER asked CHRIS if he had distributed the heroin in his possession (i.e., "Ain't nothing, are you done with that shit?"; "I said are you almost finished with that shit?"). CHRIS replied that he was almost finish selling all of the heroin (i.e., "Damn near"), and told TRAPPIER that he needed to obtain 2 bundles of heroin to sell to a customer who had just arrived at 107-53 Watson Place (i.e., "I am going to have to go back and get two whole ones for [U/I] because he just now making it").   CHRIS also advised TRAPPIER that a customer named "Q" had arrived at 107-53 Watson Place and requested 7 bundles of heroin (i.e., "motherfucker Q came and he only had wanted seven").   CHRIS further advised that he only gave "Q" 4 bundles of heroin because that was all that he had in his possession (i.e., "I only had four so I gave what I had"), and asked TRAPPIER if the cost of 4 bundles of heroin was approximately $280 (i.e., "so I gave what I had, the four for, um two eighty right?"). TRAPPIER confirmed that the cost of 4 bundles of heroin was $280 (i.e., "Uh…. yeah"). Thereafter, TRAPPIER told CHRIS that the heroin he had in his possession was the remaining heroin that needed to be distributed (i.e., "What you got is what is left"), and told CHRIS that she was asking for his inventory of heroin because she needed to get resupplied with heroin (i.e., "I need to get more").   CHRIS then asked TRAPPIER if he should give all of the proceeds of the heroin sales he consummated to POWELL (i.e., "Okay so as soon as I am done I going to give it to Sha?"), and TRAPPIER replied affirmatively (i.e., "Uh-yeah").

42.    On March 13, 2015, investigating agents intercepted the following telephone call between CHRIS, who was using the 4421 TELEPHONE, and TRAPPIER,

during which CHRIS once again reported the status of his narcotics trafficking activities to

TRAPPIER:

| | | |
|---|---|---|
| CHRIS: | | Hello. |
| TRAPPIER: | | What you said you have left? |
| CHRIS: | | Like six, five. |
| TRAPPIER: | | Shirts? |
| CHRIS: | | Yeah. |
| TRAPPIER: | | Um-hum… |
| CHRIS: | | "M" just called too. |
| TRAPPIER: | | Yeah I know he just spoke to me he wanted, wanted five whole ones. |
| CHRIS: | | Man. |
| TRAPPIER: | | So um, take that money to Shakeem, so he can put it together.   That's the total. |
| CHRIS: | | Alright. |
| TRAPPIER: | | Just take it [U/I] the money. |
| CHRIS: | | Alright.   You said say what? |
| TRAPPIER: | | Check the money [U/I] you're going right now? |
| CHRIS: | | Yeah. |
| TRAPPIER: | | Take it to him right now I am about to call him right now. |
| CHRIS: | | Alright. |

Based on my training, experience and knowledge of the investigation, I believe that during this

telephone call TRAPPIER asked CHRIS to specify how much heroin he had remaining (i.e.,

"What you said you have left?"), and CHRIS replied that he had 5 or 6 units of heroin remaining

(i.e., "Like five, six").   TRAPPIER then asked if CHRIS meant that he had 5 or 6 glassines

(i.e., "Shirts?"), and CHRIS replied affirmatively (i.e., "Yeah").   CHRIS then notified

TRAPPIER that a customer named "M" called him (i.e., "M just called too"), and TRAPPIER

told CHRIS that she knew that M would call because he told her that he wanted to purchase 5

bundles of heroin (i.e., "Yeah I know he just spoke to me he wanted, wanted five whole ones").

TRAPPIER then told CHRIS to take the money he received from M to POWELL so that

POWELL could supply him with the 5 bundles of heroin M requested (i.e., "So um, take that

money to Shakeem, so he can put it together.   That's the total").

43.     As explained above, TRAPPIER, POWELL, TROTTER and FNU LNU

(also known as "CHRIS") distribute heroin on behalf of the DTO using the 4421

TELEPHONE.  The following defendants – CURRY, WILLIAMS, BRABRAM, SCOTT,

DAVIS, CROCKER and FNU LNU (also known as "Pop") – purchase heroin directly from

LAMBUS, TRAPPIER, POWELL, TROTTER or FNU LNU (also known as "Chris").

Intercepted telephone calls and evidence obtained from confidential sources or law

enforcement officers working in an undercover capacity reveal that CURRY, WILLIAMS,

BRABRAM, SCOTT, DAVIS, CROCKER, and FNU LNU (also known as "Pop") sell the

heroin they purchase from the DTO to customers in Queens.

**Additional Distributors Within The DTO**

44.     As explained above, TRAPPIER, POWELL, TROTTER, and FNU LNU,

also known as "Chris" use the 4421 TELEPHONE to distribute heroin on behalf of the DTO,

and conduct their narcotics trafficking activities from the residence located at 107-53 Watson

Place.   The following individuals, which include CURRY, BRABRAM, CROCKER,

WILLIAMS, SCOTT, FNU LNU, also known as "Pop," MITCHELL and DAVIS are either

supplied directly by the users of the 4421 TELEPHONE, or by LAMBUS directly. Specifically, the investigation has revealed that TRAPPIER and POWELL supply BRABRAM, DAVIS, FNU LNU, also known as "Pop," and SCOTT, using the 4421 TELEPHONE, and LAMBUS supplies CURRY, CROCKER and WILLIAMS.[9]   A description of the narcotics trafficking activities of CURRY, BRABRAM, CROCKER, WILLIAMS, SCOTT, FNU LNU, also known as "Pop," DAVIS and MITCHELL is set forth below.

**HENRY CURRY**

45.   CURRY purchases heroin from LAMBUS, which he then distributes on behalf of the DTO.  For example, on April 20, 2015, investigating agents intercepted the following telephone call between CURRY and LAMBUS, during which CURRY arranged to purchase approximately 2 grams – or 60 glassines – of heroin from LAMBUS to distribute on behalf of the DTO:

| | |
|---|---|
| CURRY: | Yo, you around? |
| LAMBUS: | Yeah. |
| CURRY: | Yeah, you got uhm… you got, grams? |
| LAMBUS: | I got what? |
| CURRY: | Grams. |
| LAMBUS: | Grams? |
| CURRY: | Yeah. |
| LAMBUS: | Of what? |
| CURRY: | Uhm… uhm… the other shit bro? |

---

[9] Based upon the investigation, WILLIAMS distributes some of the same brands of heroin LAMBUS supplies to other members of the DTO.

[Pause]

LAMBUS:          How many grams?

CURRY:           One or Two.   Let me do one so I could rock that shit because I'm up here.

LAMBUS:          You said 1?

CURRY:           Two.   Give me two.   I pay 2.   Whatever you could, whatever you try you can bring out.   Give me 2.

LAMBUS:          I'm not trying to give you nothing.   You have to…

CURRY:           I'm not giving, I'm buying nigger!

LAMBUS:          [U/I] 45 dollars.

CURRY:           45?

LAMBUS:          Yeahee.

CURRY:           Alright, let me get one then.   [U/I] You heard?

LAMBUS:          Yeah, I'll be that way in a couple of minutes.

CURRY:           A'ight.   Cool.

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call, CURRY asked LAMBUS if he had grams of heroin available to distribute (i.e., "Yeah, you got uhm… you got, grams?"; "Grams?").   LAMBUS subsequently asked CURRY to specify how many grams of heroin he was requesting (i.e., "How many grams?").   CURRY replied that he wanted 1 gram of heroin so that he could distribute it (i.e., "One or Two.   Let me do one so I could rock that shit because I'm up here").   CURRY later explained that he wanted to purchase 2 grams of heroin instead of 1 gram (i.e., "Two.   Give me two.   I pay 2. Whatever you could, whatever you try you can bring out.   Give me 2").   LAMBUS replied that he would not give CURRY 2 grams of heroin at no cost (i.e., "I'm not trying to give you

nothing"), and CURRY replied by informing LAMBUS that he would purchase the heroin (i.e., "I'm not giving, I'm buying nigger!").   LAMBUS then told CURRY that the cost of the heroin would be $450 (i.e., "[U/I] 45 dollars"), and CURRY asked LAMBUS to supply him with 1 gram of the heroin (i.e., "Alright, let me get one then").   LAMBUS confirmed that he would go to CURRY's location within minutes to sell him the gram of heroin (i.e., "Yeah, I'll be that way in a couple of minutes").

46.     On May 15, 2015, investigating agents intercepted another telephone call between LAMBUS and CURRY.   During this telephone call, CURRY and LAMBUS discussed CURRY's efforts to increase the amount of heroin he was distributing on behalf of the DTO.   During this telephone call, the following conversation occurred:

LAMBUS:          Damn, whats it going on like two weeks now?

CURRY:           Yeah, I know.   This shit is moving slow as hell my nigga. I'm not even gonna lie.

LAMBUS:          What[U/I]?

CURRY:           My people's, I don't got that much people.

LAMBUS:          How many you got left?

CURRY:           How many people?

LAMBUS:          I don't now people…

[VOICES OVERLAP]

CURRY:           How many [U/I]?   I got like one and a half.

LAMBUS:          This shit is crazy.

CURRY:           I don't even got like one and a half.   I'm bugging the fuck out.   I got like one…   I got one.

LAMBUS:          What happened to all your peoples [U/I] these niggas [U/I].

CURRY:          I got them still, but she got to [U/I] niggas got court dates and shit, talking about they can't [U/I]… all types of shits so I don't know.   I guess I'ma hold off after a while, after this until I can get my phone back popping.     I don't want you… holding you off cause of my shit.

LAMBUS:        Figure out what you gonna do man.   I mean…   I don't know what you want to do man.   You have to do something…

Based on my experience and knowledge of the investigation, I believe that during this telephone call, CURRY told LAMBUS that he was having difficulty selling heroin on behalf of the DTO (i.e., "Yeah, I know.   This shit is moving slow as hell my nigga.   I'm not even gonna lie").   LAMBUS then asked CURRY to specify the quantity of heroin he had remaining (i.e., "How many you got left?"), and CURRY later explained that he had approximately 1 or 1 ½ units of heroin remaining (i.e., "I got like one and a half").   CURRY later complained that he did not even have 1 ½ units of heroin remaining, and instead reported that he only had 1 unit of heroin remaining (i.e., "I don't even got like one and a half.   I'm bugging the fuck out.   I got like one… I got one").   LAMBUS then asked CURRY what happened to all of his customers (i.e., "What happened to all your peoples?"), and CURRY replied that he still had customers, but some of them were unavailable due to incarceration (i.e., "I got them still, but she got to [U/I] niggas got court dates and shit, talking about they can't [U/I]").   CURRY then told LAMBUS that he would delay his requests for a re-supply of heroin until his sales increased (i.e., "I guess I'ma hold off after a while, after this until I can get my phone back popping.   I don't want you…   holding you off cause of my shit").   LAMBUS then advised CURRY to rectify the situation (i.e., "Figure out what you gonna do man"; "You have to do something…").

47.    CURRY and LAMBUS then continued their discussion of CURRY's heroin trafficking operations, and discussed the heroin trafficking operations of the DTO in general:

| | |
|---|---|
| CURRY: | I know[U/I] and shit, you know I do my nigga.   I want to make it some type of way like if I stand out there you telling me that ain't many people gonna come up… so I don't know what to do.   I don't know what to really do no more. |
| LAMBUS: | There ain't no money up there…   Lye and them be up there.   There ain't no money.   You might have to come down on your prices and get back on your grind.   Come down on your prices, build… |
| CURRY: | I do that. |
| LAMBUS: | You over there… where's all these people that Pops seeing? |
| CURRY: | I could stay at my sisters house.   I'll stay out there. |
| LAMBUS: | Pop is seeing somebody.   Pop make money so he seeing somebody from over there. |
| CURRY: | He seeing Bobby. |
| LAMBUS: | Huh?  I'm not talking about seeing Bobby.  I'm talking about he got a clientele.   It's got to be somebody.   It's people over there, and he's not paying… they not charging. He's not charging niggas ten dollars a bag.   He's charging some of them people more.   You need to find out who these people is.   You need to work something out with them.   You need to do something, but whatever you do nigga… You got to do something. |
| CURRY: | I'ma make something happen.   I ain't gonna sit on my ass. |

*       *       *

| | |
|---|---|
| LAMBUS: | How do you go from moving three hundred… fuck anybody else.   You can't blame nobody else but yourself. |

CURRY:           I'm taking the blame for it though.   I'm taking the blame for everything.

LAMBUS:      You went from two hundred bundles, three hundred bundles to forty bundles, because you wanted…   you wanted to sit uptown and let other niggas do that.   You let Dre devo his way in there.   You gave Tone lane.   Nigga you had… you can't blame nobody son, but your selfish ways.   You wasn't feeding these niggas.   You had Dot Kim, you had Shakeem, you had Bob.   You had all these people[U/I] for you, but you was shieffing them and…

CURRY:           I never shiefed them, I always… Everything I had I went half with him.   I swear to god I never shiefed.

LAMBUS:      Whatever way you did it, whatever you did you fucked up, cause before it was Dre, before it was Tone, before any of them people Bricktown… you had that.   You fucked that up.   You can't blame…

[VOICES OVERLAP]

CURRY:           I can't get no type of way into that though, Like you can't put me a little weight into the [U/I]?

LAMBUS:      Listen all I did was give her the phone, gave her a phone.   I don't have no people.   I don't go around looking for these people.   All I did was give her the phone, told Lye and them… the niggas that's in the town what prices and she went off from there.   I didn't do that.   That's the thing about it, dope sells itself.   If it's good, and good prices.   She built that shit up herself.   I didn't put 20 niggas up there to buy it, I didn't do that.   That shit built itself, because they come for the price nigga.

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call CURRY and LAMBUS were discussing their narcotics distributing activities, as well as the narcotics distribution activities of BRABRAM, TRAPPIER, POWELL and others. CURRY expressed his frustration to LAMBUS, stating that it would be difficult for him to sell heroin on the street because customers would not approach him (i.e., "I want to make it some

type of way like if I stand out there you telling me that ain't many people that gonna come up…
so I don't know what to do.  I don't know what to really do no more").  LAMBUS then
advised CURRY that BRABRAM, who he referred to as "Lye," and other unidentified
distributors were selling heroin in the area where CURRY proposed to sell his heroin (i.e.,
"There ain't no money up there… Lye and them be up there.  There ain't no money"), and
advised CURRY to sell the heroin he was distributing at a lower price (i.e., "You might have to
come down on your prices and get back on your grind.   Come down on your prices, build…").
CURRY replied that he was already doing so (i.e., "I do that"), and asked LAMBUS for
information about POP's source of supply (i.e., "You over there… where's all these people that
Pop[']s seeing?").  Thereafter, LAMBUS stated that Pop had customers in an unspecified
location (i.e., "Pop is seeing somebody.  Pop make money so he seeing somebody from over
there").  CURRY then asked if POP's source of supply was TRAPPIER (i.e., "He seeing
Bobby"), and LAMBUS replied that CURRY was mistaken regarding his belief that POP was
receiving heroin from TRAPPIER (i.e., "I'm not talking about seeing Bobby").  LAMBUS
then clarified that he was stating that POP had heroin customers (i.e., "I'm talking about he got
a clientele"), and told CURRY that POP was charging some of his customers more than $10 per
bag of narcotics (i.e., "He's not charging niggas ten dollars a bag.  [H]e's charging some of
them people more").  LAMBUS also advised CURRY to find out who POP's customers were,
so that he could arrange to sell heroin to them (i.e., "You need to find out who these people is.
You need to work something out with them").  LAMBUS later told CURRY that he used to
sell 300 bundles of heroin (or approximately 90 grams) of heroin, and was not in a position to
blame anyone but himself for the decline in his sales (i.e., "How do you go from moving three
hundred… fuck anybody else.   You can't blame nobody else, but yourself").  CURRY replied

by accepting responsibility for his recent struggle to sell heroin (i.e., "I'm taking the blame for it though.  I'm taking the blame for everything").  LAMBUS then told CURRY that he went from selling 200 bundles of heroin (60 to 90 grams) to 40 bundles (12 grams), because he was lazy and allowed others to take his customers (i.e., "You went from two hundred bundles, three hundred bundles to forty bundles, because you wanted… you wanted to sit uptown and let other niggas do that.  You let Dre devo his way in there.  You gave Tone lane").  LAMBUS also attributed CURRY's lost business to the fact that he failed to pay the members of the DTO who distributed heroin on his behalf, including POWELL, SHAVONA TRAPPIER and DAYKM TRAPPIER,[10] adequately (i.e., "Nigga you had... you can't blame nobody son, but your selfish ways. You wasn't feeding these niggas. You had Dakym, you had Shakeem, you had Bob. You had all these people [UNINTELLIGIBLE] for you, but you was shieffing them and...").

CURRY replied by stating that he did not deprive his distributors of the money due to them for their efforts (i.e., "I never shiefed them, I always… Everything I had I went half with him.  I swear to god I never shiefed him").  Later LAMBUS explained to CURRY that he gave TRAPPIER the 4421 TELEPHONE to develop a group of heroin customers and told her the price of heroin, and she successfully built a robust customer base on her own (i.e., "Listen all I did was give her the phone, gave her a phone.  I don't have no people.  I don't go around looking for these people.  All I did was give her the phone, told Lye and them… the niggas that's in the town what the price is and she went off from there.  I didn't do that").  LAMBUS then explained that high

---

[10] On July 1, 2014, while executing a judicially authorized search warrant, NYPD officers arrested Daykym Trappier.  Daykm Trappier is Shavona Trappier's brother.  During the arrest, which took place at a house located in Queens, New York, officers seized heroin, a loaded firearm and a quantity of U.S. currency.  Dakym Trappier was charged with state narcotics and firearms offenses, and his case is pending.  When law enforcement officers arrested Dakym Trappier, they also located approximately 90 glassines (or 3 grams) of heroin on his person.

quality heroin would sell, so long as it is sold at the appropriate price (i.e., "That's the thing about it, dope sells itself.   If it's good, and good prices"), and reiterated that TRAPPIER built her own customer base by selling heroin at the right price (i.e., "She built that shit up herself.   I didn't put 20 niggas up there to buy it, I didn't do that.   That shit built itself, because they come for the price nigga").

48.     Later during this telephone call, LAMBUS instructed CURRY to sell at least 50 bundles of heroin per week during the following exchange:

| | |
|---|---|
| CURRY: | I'ma get my line back man, I'ma get my shit back. |
| LAMBUS: | At least do like fifty.   You got to do like fifty a week. |
| CURRY: | I can get it back son.   I'm about to get back on my shit.   I know what to do. |
| LAMBUS: | You got to do something. |
| CURRY: | I'm about to get back. |
| LAMBUS: | You got to do something, cause two weeks for forty joints is ridiculous son. |

Based on my knowledge of the investigation, I believe that during this exchange, CURRY told LAMBUS that he would increase the amount of heroin he was selling on behalf of the DTO (i.e., "I'ma get my line back man, I'ma get my shit back").   LAMBUS instructed CURRY that he needed to sell at least 50 bundles of heroin (or approximately 15 grams) on a weekly basis (i.e., "At least do like fifty.   You got to do like fifty a week"), and CURRY assured LAMBUS that he would (i.e., "I can get it back son.   I'm about to get back on my shit.   I know what to do").   LAMBUS then reiterated that CURRY needed to increase the amount of heroin he was selling weekly (i.e., "You got to do something"), and CURRY reassured LAMBUS that he would do so (i.e., "I'm about to get back").   LAMBUS advised CURRY that selling 40 bundles

during a 2-week period was insufficient (i.e., "You gotta do something, cause two weeks for forty joints is ridiculous son").

**SEAN BRABRAM**

49.     Intercepted telephone calls and evidence obtained from a law enforcement agent acting in an undercover capacity ("UC") reveal that BRABRAM purchases heroin from TRAPPIER, which he then distributes on behalf of the DTO.  For example, between February 23, 2015 and February 24, 2015, BRABRAM arranged to sell one sleeve of heroin to a UC, and advised the UC that he would attempt to obtain a firearm.

50.     Specifically, on February 23, 2015, the UC called BRABRAM, but BRABRAM did not answer the telephone.  Later that day, however, BRABRAM called the UC.  During this telephone call, the UC told BRABRAM that the UC wanted to purchase 1 sleeve of heroin on February 24, 2015.   BRABRAM told the UC, in sum and substance, that he would obtain the heroin.  The UC also asked BRABRAM if he could also sell the UC a firearm, and BRABRAM responded that he was in Brooklyn attempting to obtain firearms from his brother-in-law.

51.     On February 24, 2015 at approximately 11:19 a.m., BRABRAM called the UC and asked him/her what time he/she would arrive in Queens to purchase the heroin. The UC responded that he/she would arrive at approximately 12:00 p.m.   During this telephone call, BRABRAM also advised the UC that his associates informed him that they did not have firearms available, but that the firearms would arrive in Brooklyn later that week. BRABRAM then asked the UC to clarify what he/she wanted to purchase, and the UC told BRABRAM that he/she wanted to purchase 1 sleeve of heroin.

52.    At approximately 11:29 a.m., investigating agents intercepted a telephone call between TRAPPIER, who was using the 4421 TELEPHONE, and BRABRAM.   During this telephone call, the following conversation took place:

| | |
|---|---|
| TRAPPIER: | Yo? |
| BRABRAM: | Yo what's up it is Lye. |
| TRAPPIER: | What up? |
| BRABRAM: | My people is coming through the ones I sent to before, remember… alright. |
| TRAPPIER: | Um-hum…. |
| BRABRAM: | I need a whole sleeve, what's the number? |
| TRAPPIER: | Seven. |
| BRABRAM: | Come on man… |
| TRAPPIER: | Huh? |
| BRABRAM: | Six-fifty? |
| TRAPPIER: | Hell no! |
| BRABRAM: | What you mean hell no?   Come on man…   I know that the [U/I]. |
| TRAPPIER: | Six-eighty, the less I will go is six-eighty. |
| BRABRAM: | Alright.   Listen to me, around twelve o'clock please and I am begging you, man please be in the neighborhood man. |
| TRAPPIER: | Alright. |
| BRABRAM: | Don't shit on me please, these people want to come and they want to leave, and that's why I am calling you early so that way you would be aware because it is a definitely go you understand. |
| TRAPPIER: | What the four? |

BRABRAM:          No the sleeve, man.

TRAPPIER:          Alright.

Based on my training, experience and knowledge of the investigation, I believe that during the

above-referenced telephone call, BRABRAM asked TRAPPIER to supply him with 1 sleeve of

heroin, so that he could distribute the heroin to the UC.   In particular, BRABRAM told

TRAPPIER that he had a customer who wanted to purchase heroin (i.e., "My people is coming

th[r]ough the ones I sent to before, remember … alright"), and TRAPPIER responded that she

understood (i.e., "Um-hum").   BRABRAM then told TRAPPIER that he needed a sleeve of

heroin and asked her what a sleeve of heroin would cost him (i.e., "I need a whole sleeve,

what's the number?"), and TRAPPIER replied that a sleeve of heroin would cost him $700 (i.e.,

"Seven").   BRABRAM then tried to negotiate a lower cost for the heroin, asking TRAPPIER

to sell him the heroin for $650 (i.e., "Come on man…"; "Six-fifty").   TRAPPIER told

BRABRAM that she would not sell the heroin for less than $680 (i.e., "Six-eighty, the less I

will go is six-eighty"), and BRABRAM agreed to purchase the heroin at this price (i.e.,

"Alright").   BRABRAM then told TRAPPIER that he desperately needed the sleeve of heroin

by 12:00 p.m. (i.e., "Listen to me, around twelve o'clock please and I am begging you, man

please be in the neighborhood man").   TRAPPIER replied that she understood (i.e., "Alright").

BRABRAM then implored TRAPPIER to provide the heroin on time because his customers

wanted to come to Queens, obtain the heroin and depart immediately (i.e., "Don't shit on me

please, these people want to come and they want to leave, and that's why I am calling you early

so that way you would be aware because it is a definitely go you understand").

53.   At approximately 12:43 p.m. on February 24, 2015, the UC called

BRABRAM and told him that he/she was running late.   BRABRAM told the UC to meet him

in the vicinity of 105th Avenue and 177th Street in Queens to purchase a sleeve of heroin. BRABRAM told the UC that he/she had to pay $680 for the sleeve of heroin, because BRABRAM's source of supply told him that she could not sell it to him for $600, and advised the UC to meet him near a laundromat in the vicinity of 105th Avenue.

54.     Thereafter, the UC drove to the Sunny Laundromat located at 105-18 105th Street, where investigating agents were conducting surveillance, and met BRABRAM. When the UC arrived at this location, investigators observed BRABRAM enter the UC's vehicle.   Upon entering the UC's vehicle, BRABRAM directed the UC to drive to the vicinity of 105th Avenue.   BRABRAM then told the UC to remain in the vehicle while BRABRAM met his source of supply.   The UC then gave BRABRAM $680.   Moments later, BRABRAM's source of supply drove a gray 2012 Chrysler vehicle with New York license plate number FZH-5718 to the vicinity of 105th Avenue and parked a few car lengths away from the UC's vehicle, facing in the opposite direction of the UC's vehicle.[11]

55.     Law enforcement agents then observed BRABRAM exit the UC's vehicle and walk to the 2012 Chrysler.   At this point, the UC exited his/her vehicle and observed BRABRAM and the operator of the 2012 Chrysler counting the money that BRABRAM handed him.   BRABRAM then returned to the UC's vehicle.   Upon entering the UC's vehicle, BRABRAM handed the UC ten bundles (100 glassines) of heroin bearing the "Coca Cola" label and "King Kong" label.   The UC then handed BRABRAM $120 as

---

[11] The 2012 Chrysler vehicle was registered to Tremaine Angevine, 189-22 116th Road, St. Albans, New York 11434, who is a relative of KAMEL LAMBUS.   Law enforcement agents have observed LAMBUS driving this vehicle on multiple occasions.

compensation for arranging the transaction, and drove BRABRAM to Sunny Laundromat, where BRABRAM exited the UC's vehicle.

56.     In addition to selling heroin to the UC on February 24, 2015, BRABRAM arrange to sell heroin to the UC on March 2, 2015.   In particular, on March 2, 2015, the UC contacted BRABRAM, and told him that he/she wanted to purchase a sleeve of heroin.   Later that day, BRABRAM called the UC, and during this telephone call the UC told BRABRAM that he/she wanted to see him at 12:15 p.m. on March 3, 2015 to purchase a sleeve of heroin. BRABRAM agreed.

57.     At approximately 4:38 p.m., BRABRAM called the 4421 TELEPHONE attempting to contact TRAPPIER to obtain a sleeve of heroin to supply to the UC.   During this telephone call, BRABRAM asked POWELL, who answered the 4421 TELEPHONE, "Where Bobby at?"[12]   POWELL told BRABRAM that TRAPPIER was "not around," and BRABRAM then told POWELL that he needed a sleeve of heroin to supply a customer who would be arriving in Queens on March 3, 2015 (i.e., "Alright, listen, I had some people come through last night for a whole thing.   Let her know that they are coming through tomorrow too, alright?").

58.     The following day, BRABRAM contacted the UC via text message to confirm that he/she still planned to consummate the heroin transaction they had discussed on March 2, 2015.  Specifically, BRABRAM sent the UC a text message which stated "hey big bro ru still cming 2c me yes or not," and the UC responded with a text message stating "Yeah bro, I'll be there about 12 noon.   Ok bro, yes I'm still coming."   BRABRAM then sent a text message to the UC which stated, in sum and substance, that he would order 1 sleeve of heroin

---

[12] As set forth above, "Bobby" is a nickname commonly used for SHAVONA TRAPPIER.

for the UC.  BRABRAM also directed the UC, in sum and substance, to meet him in the vicinity of the laundromat where they had previously met to conduct a narcotics transaction.

59.    At 11:30 p.m., investigating agents intercepted a telephone call between BRABRAM and TRAPPIER, during which BRABRAM arranged for TRAPPIER to supply him with a sleeve heroin to sell to the UC.   In particular, at 11:31 p.m., investigating agents intercepted the following conversation between TRAPPIER, who was using the 4421 TELEPHONE, and BRABRAM:

| | |
|---|---|
| BRABRAM: | Listen, my people's is coming through to grab that same thing they grab the last time from you. |
| TRAPPIER: | Yeah. |
| BRABRAM: | They coming through at 12 or 12:10 the latest. |
| TRAPPIER: | Alright. |
| BRABRAM: | I'll see you then. |
| TRAPPIER: | Alright. |
| BRABRAM: | I'll see you at the same place we meet up before, that way there's no complications. |
| TRAPPIER: | Alright. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call, BRABRAM told TRAPPIER that his customer, who he referred to as "my people[]" would be arriving to purchase a sleeve of heroin (i.e., "Listen, my people's is coming through to grab that same thing they grab the last time from you"), and TRAPPIER stated that she understood (i.e., "Yeah").   BRABRAM subsequently told TRAPPIER that his customer would arrive at 12:00 p.m. or 12:10 p.m. (i.e., "They coming through at 12 or 12:10 the latest"),

and that he would meet TRAPPIER at the same location where he met her on February 24, 2015 (i.e., "I'll see you at the same place we meet up before, that way there's no complications").

60.     At approximately 12:03 p.m., investigating agents conducted surveillance in the vicinity of 177th Street and 105th Avenue and 107-53 Watson Place.   Thereafter, the UC drove to the vicinity of Sunny Laundromat.   When the UC arrived at the laundromat, law enforcement agents observed BRABRAM enter the UC's vehicle.   Upon entering the UC's vehicle, BRABRAM directed the UC to drive to a location in the vicinity of 105th Avenue. However, upon reaching that location, the UC and BRABRAM observed that the location where they intended to consummate the transaction was inaccessible due to construction.   As a result, BRABRAM directed the UC to drive to the vicinity of 104th Road, park and await his source of supply.   After the UC parked, BRABRAM entered the UC's vehicle.   After BRABRAM entered the vehicle, the UC handed him $680.

61.     Subsequently, law enforcement officers observed a grey 2001 Nissan vehicle bearing New York license plate number GPS7853 arrive in the vicinity of 104th Avenue and park directly behind the UC's vehicle.   BRABRAM then exited the UC's vehicle and walked to the grey vehicle, while the driver of the vehicle, TRAPPIER, exited the vehicle and walked towards BRABRAM.   The UC then observed BRABRAM hand TRAPPIER the $680 the UC had given to BRABRAM.   TRAPPIER then counted the money and gave BRABRAM a black plastic bag, and BRABRAM returned to the UC's vehicle and gave the UC the black plastic bag.   The black plastic bag contained ten bundles (100 glassines) of heroin. The heroin was wrapped in glassine envelopes bearing the label "King Kong".

**TIHEEM CROCKER**

62.     The investigation has also revealed that CROCKER sells the "Undisputed" brand of heroin on behalf of the DTO, and that LAMBUS supplies CROCKER with heroin, which he distributes on behalf of the DTO.   For example, on November 10, 2014, a confidential source ("CS#1")[13] called CROCKER, and asked him to purchase a sleeve of heroin in exchange for $900.   CROCKER told CS#1, in substance and in part, that he would meet him/her in the vicinity of 227th Street and 119th Street in Cambria Heights, New York. Prior to heading to this location, CS#1 met with investigating agents at a predetermined location, where investigating agents searched his person for contraband.   The search yielded negative results.   At approximately 12:28 p.m., CS #1 met CROCKER in the vicinity of 227th Street and 119th Street.   During the meeting, CS #1 handed CROCKER $900, and CROCKER gave CS#1 1 sleeve of heroin.   CS #1 then departed from the vicinity of 227th Street and 119th Street and met investigating agents at a predetermined location.   Upon meeting investigating agents at the predetermined location, CS#1 handed them the heroin he/she had received from CROCKER.   The heroin CROCKER sold to CS#1 was marked with a stamp bearing the name "Undisputed."

63.     Intercepted telephone calls obtained during this investigation, have also revealed that LAMBUS supplies CROCKER with narcotics to distribute on behalf of the DTO.

---

[13]  CS#1 has been cooperating with law enforcement officers for approximately 5 years in exchange for monetary compensation.   During this time, CS#1 has provided information that has been reliable and credible.   CS#1 has previously been convicted of narcotics-related offenses.   For example, in or about February 2015, CS#1 was arrested and subsequently convicted of narcotics-related offenses, for which he/she paid a fine.

For example, on May 12, 2015, investigating agents intercepted the following telephone call between CROCKER and LAMBUS:

| LAMBUS: | Hello. |
|---|---|
| CROCKER: | Yo. |
| LAMBUS: | Where you at? |
| CROCKER: | Shit, what's good, where you at?   You in the Ave? |
| LAMBUS: | Yeah. |
| CROCKER: | What you got?   You got, um, First Take or you got both still? |
| LAMBUS: | First Take but it's the same thing.   I go the second batch of the First Take.   I just ran out of the other shit. |
| CROCKER: | Alright.   Imma call you back in like 15 minutes, let you know what I need, real quick. |
| LAMBUS: | Alright.   It's the same shit though. |
| CROCKER: | I know, it don't matter. |
| LAMBUS: | Alright. |
| CROCKER: | Alright. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call CROCKER asked LAMBUS to supply him with the brand of heroin labeled "First Take," so that CROCKER could sell it to his customers.   In particular, CROCKER asked LAMBUS if he had the "First Take" brand of heroin in his possession (i.e., "What you got?   You got, um, First Take or you got both still?").   LAMBUS replied that he had the First Take brand of heroin in his possession (i.e., "First Take but it[']s the same thing.   I go[t] the second batch of the First Take"), and told CROCKER that he no longer had another

unidentified brand of heroin in his possession (i.e., "I just ran out of the other shit").

CROCKER then stated that he understood (i.e., "Alright") and told LAMBUS that he would

call him in approximately 15 minutes to request a specific quantity of the First Take brand of

heroin (i.e., "Imma call you back in like 15 minutes, let you know what I need, real quick").

LAMBUS stated that he understood, and reiterated that the First Take brand of heroin was the

same brand of heroin he was previously distributing (i.e., "Alright.   It[']s the same shit

though").   CROCKER then stated that First Take brand of heroin was acceptable (i.e., "I

know, it don't matter").

       64.    On May 20, 2015, investigating agents also intercepted the following

telephone conversation between LAMBUS and CROCKER, during which CROCKER

attempted to purchase a brand of heroin from LAMBUS labeled "white girl":

| | |
|---|---|
| LAMBUS: | Hello. |
| CROCKER: | Yo, you got some white girl? |
| LAMBUS: | If I got what? |
| CROCKER: | White girl. |
| LAMBUS: | What? |
| CROCKER: | Some white girl nigga, white, white girl. |
| LAMBUS: | Nah, nah, nah, nah, nah. |
| CROCKER: | You know somebody with it? |
| LAMBUS: | Nah, not right now. |
| CROCKER: | Alright. |

Based on my training, experience and knowledge of the investigation, I believe that during this

exchange, CROCKER asked LAMBUS if he could provide him with a brand of heroin labeled

"white girl" (<u>i.e.</u>, "Yo, you got some white girl?").   LAMBUS told CROCKER that he did not

have the "white girl" brand of heroin in his possession (<u>i.e.</u>, "Nah, nah, nah, nah, nah"), and

CROCKER then asked LAMBUS if he know someone who was selling it (<u>i.e.</u>, "You know

somebody with it?").   LAMBUS replied that he did not (<u>i.e.</u>, "Nah, not right now") and

CROCKER stated that he understood (<u>i.e.</u>, "Alright").

### FNU LNU, also known as "Pop"

65.   The investigation has revealed that POP also distributes heroin on behalf of

the DTO, which he purchases from TRAPPIER and LAMBUS.   The specific brands of heroin POP

distributes on behalf of the DTO appear to be, among others, the "Sweet Dreams," "First Take" and

"Coca Cola" brands of heroin.   For example, on March 3, 2015, investigating agents intercepted

the following telephone call between POP and POWELL, who was using the 4421 TELEPHONE:

| | |
|---|---|
| POWELL: | Yo Pop, Pop, Pop.   Try to make it here now.   I got, look make it some more seven coke-cola left too…   Seven shirts. |
| POP: | You know that I need six, you know what I need. |
| POWELL: | Alright so come, that's it come. |
| POP: | I can't make right, right now I could make it within the hour. |
| POWELL: | Come so you got time.   That is what homeboy said that he is going to be here in an hour so. |
| [VOICE OVERLAP] | |
| POP: | Alright, alright. |
| POWELL: | That is 50/50 you some nigga be you already know, they say that there are coming and they don't show. |
| POP: | Alright, alright. |
| POWELL: | I am not holding shit no more. |

POP:                    Alright, if he do show you're not going to take care of
                        business after that?

POWELL:                 I am still going to do, still going to take care of business.

POP:                    So regardless you should be go when I get over there right?

POWELL:                 Yeah I should be good still.

POP:                    Alright, alright so I don't got nothing to worry about has long.

POWELL:                 That's what I was trying to tell you from the jump.

POP:                    Okay.

POWELL:                 Someone supposed to be coming or the ten, and I got four
                        left because somebody wanted five too neither
                        way when I am when I am done with this like fifteen minutes
                        I get more I rather you get a new batch.

POP:                    All I am concerned about is how long is the wait?

POWELL:                 How about this Pop.   Wait for the first batch because I
                        think we getting coke-cola so it could be mixed.

POP:                    Yeah, yeah the mixed is great.

POWELL:                 Yeah.

POP:                    Especially if you could do it on the 5-5.

POWELL:                 Yeah.

POP:                    That would be great.

POWELL:                 Yeah.

POP:                    I just concerned when this nigga K when he is going to sell
                        out because K says that he will be there in a minute and
                        half and hour later he be like "yo it is going to take me an
                        hour."   [LAUGHS]

POWELL:                 He coming for his money…     He is coming for this.

POP:                    Alright, alright I will hit you back in minutes.

POWELL:                 Alright.

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call POWELL informed POP that he had 7 bundles of heroin bearing the label "Coca Cola" in his possession available for distribution (i.e., "Yo Pop, Pop, Pop. Try to make it here now. I got, look make it some more seven coke-cola left too… Seven shirts"). POP replied by informing POWELL that he needed 6 bundles of the Coca Cola brand of heroin (i.e., "You know that I need six, you know what I need"), and POWELL told POP to come to his location so that he could supply POP with 6 bundles of heroin (i.e., "Alright so come, that's it come"). POP told POWELL that he would go to his location within an hour (i.e., "I can't make right, right now I could make it within the hour"), and POWELL informed POP that he had a customer who would arrive within an hour (i.e., "That is what homeboy said that he is going to be here in an hour or so"). POP replied by stating that he understood (i.e., "Alright"), and POWELL told him that some of his customers were unreliable insofar as they claimed that he would come to his location to purchase heroin, but often failed to do so (i.e., "That is 50/50 you some nigga be you already know, they say that there are coming and they don't show"). POWELL then told POP that he would not hold heroin for unreliable customers (i.e., "I am not holding shit no more"). Thereafter, POP asked POWELL to confirm that he would still have heroin available to sell to POP within the hour irrespective of whether the customer arrived (i.e., "So regardless you should be go when I get over there right?"), and POWELL replied affirmatively (i.e., "Yeah I should be good still").

POWELL later told POP that he had customers scheduled to come to his location to purchase a total of 10 unspecified units of heroin (i.e., "Someone supposed to be coming [f]or the ten, and I got four left because somebody wanted a five too neither way when I am when I am done"), and that he preferred to give POP a new batch of heroin (i.e., "I rather you get a new batch"). POP then stated that he wanted to know how long he would have to wait for the new batch (i.e., "All I am concerned

about how long is the wait?").   POWELL advised POP to wait for the new batch of heroin, because he believed that the new batch of heroin would contain the Coca Cola brand of heroin as well as others (i.e., "How about this Pop.   Wait for the first batch because I think we getting coke-cola so it could be mixed").   POP replied that he liked the idea of receiving a mixed batch of heroin, containing both the Coca Cola brand and another brand (i.e., "Yeah, yeah the mixed is great"). POP then emphasized that he preferred to receive a mix of 5 bundles of the Coca Cola brand of heroin and 5 bundles of another brand of heroin (i.e., "Especially If you could do it on the 5-5"; "That would be great").   POP also stated that he was concerned that LAMBUS, who he referred to as "K," would sell all of the heroin in his possession before resupplying POWELL, and that he was concerned that LAMBUS would not arrive on time to resupply POWELL (i.e., "I just concerned when this nigga K when he is going to sell out because K says that he will be there in a minute and half an hour later he be like 'yo it is going to take me an hour'").   POWELL then told POP that LAMBUS would arrive, because he was coming to POWELL's location to collect the proceeds of heroin sales made by POWELL (i.e., "He coming for his money... He is coming for this").

66.    On May 11, 2015, investigating agents intercepted the following telephone call between POWELL, who was using the 4421 TELEPHONE, and POP, during which they had the following conversation:

| | |
|---|---|
| POP: | Everything good? |
| POWELL: | Yeah. |
| POP: | What ya working with? |
| POWELL: | Both sides.   The sweet dreams and first pick shit. |
| POP: | Let me get five and five. |
| POWELL: | My brother five and five. |

| POP: | I call you back when I get to the crib I am on the way to the crib now. |
|---|---|
| POWELL: | Alright. |

Based on my training, experience and knowledge of the investigation, I believe that during this exchange, POP asked POWELL to specify the brands of heroin he had available for distribution (i.e., "What ya working with?"), and POWELL replied that he had both the "Sweet Dreams" and "First Pick" brands of heroin available (i.e., "Both sides.   The sweet dreams and first pick shit").   POP then requested five units of the Sweet Dreams brand of heroin and five units of the First Pick brand of heroin (i.e., "Let me get five and five").   POWELL stated that he would have the heroin ready for POP to purchase (i.e., "My brother five and five"), and POP told POWELL that he would call him when he was on the way to 107-53 Watson Place to pick up the heroin (i.e., "I call you when I get to the crib I am on the way to the crib now").

67.   On June 11, 2015, investigating agents intercepted the following telephone call between POP, and TROTTER, using the 4421 TELEPHONE:

| TROTTER: | Yo. |
|---|---|
| POP: | What's good?   Its Pop. |
| TROTTER: | What's up? |
| POP: | Where's Bobby at? |
| TROTTER: | Bobby not around. |
| POP: | Shay around? |
| TROTTER: | Nah. |
| POP: | So ya nigga's aint got no wheels? |
| TROTTER: | Right, no.   We good. |

| | |
|---|---|
| POP: | Huh? |
| TROTTER: | We good, we good, we good. |
| POP: | Oh you got wheels? |
| TROTTER: | Yeah. |
| POP: | Oh alright, I need to see ya'll for that, the usual.   That whole.   That arm.   That arm. |
| TROTTER: | What? |
| POP: | That arm.   That arm.   That whole arm.   Sleeve.   Sleeve. Sleeve. |
| TROTTER: | Right. |
| POP: | Aight.   You know where you going right? |
| TROTTER: | Yeah. |
| POP: | How long? |
| TROTTER: | A couple of minutes. |
| POP: | Alright. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call, POP asked TROTTER if TRAPPIER or POWELL were available for the purpose of selling him heroin (i.e., "Where's Bobby at?"; "Shay around?"), and TROTTER informed POP that neither were available (i.e., "Bobby not around"; "Nah").   Thereafter, POP asked TROTTER if the DTO had any heroin available for distribution (i.e., "So ya nigga's aint got no wheels?"), and TROTTER stated that he had heroin available (i.e., "We good, we good, we good").   POP then asked TROTTER if he could purchase a sleeve of heroin (i.e., "Oh alright, I need to see ya'll for that, the usual.   That whole.   That arm.   That arm"), and TROTTER asked POP to clarify his request (i.e., "What?").   POP then stated explicitly that he

needed to purchase a sleeve of heroin for distribution (i.e., "That arm.   That arm.   That whole arm.   Sleeve.   Sleeve.   Sleeve").   TROTTER replied that he understood (i.e., "Right"), and POP asked him if he knew where to go to deliver the sleeve of heroin (i.e., "Aight.   You know where you going right?").   TROTTER replied that he did and informed POP that he would arrive within a couple of minutes (i.e., "Yeah"; "A couple of minutes").

### SCOTT WILLIAMS[14]

68.     The investigation has revealed that SCOTT WILLIAMS is a member of the POV City/PCG sect of the Bloods gang, who distributes heroin in Queens, New York.   The heroin WILLIAMS distributes in Queens, New York is marked with some of the same labels used by the DTO, such a gold foil circle with a black fist and the word "Power" emblazoned on the fist, the "Universal" stamp, and the "Pepsi" stamp.

69.     For example, on November 10, 2014, WILLIAMS arranged to sell CS#1 approximately 1 sleeve (100 glassines) of heroin.   At approximately 11:15 a.m. on November 10, 2014, investigating agents met CS#1 at a predetermined location and searched his/her person and vehicle for contraband.   The search yielded negative results.   During this meeting, CS#1 called WILLIAMS to confirm that WILLIAMS would sell him/her heroin.   During this telephone call, WILLIAMS told CS#1 that he/she would come to the vicinity of 227th Street and 119th Avenue, Cambria Heights, New York 11411 to consummate the transaction.   At approximately 12:28 p.m., investigating agents who were conducting surveillance observed

---

[14]  WILLIAMS is a known member of the PCG/POV City street gang.   Specifically, WILLIAMS has a tattoo covering his upper left shoulder which states "POV CITY." Moreover, on numerous occasions, law enforcement officers have observed WILLIAMS physically located near, and associating with, LAMBUS and other members of the PCG/POV City street gang.

WILLIAMS drive a Chevrolet Camero bearing a Rhode Island license plate arrive in the vicinity of 227th Street and 119th Avenue.  The agents then observed WILLIAMS gesture towards CS#1, signaling for him/her to meet WILLIAMS at the vehicle.  Shortly thereafter, CS#1 met WILLIAMS at WILLIAMS's vehicle.  CS#1 then departed from WILLIAMS's vehicle, entered his/her own vehicle and departed from the area.

70.    CS#1 then met investigating agents at a predetermined location.  During the meeting, CS#1 handed investigators 10 bundles (100 glassines) of heroin that he received from WILLIAMS.  Each bundle contained glassines marked with a gold foil circle with a black fist and the word "Power" emblazoned on the fist.[15]

**EARL DAVIS**

71.    The investigation has revealed that EARL DAVIS sells heroin on behalf of the DTO, which he receives from TRAPPIER.

72.    On December 17, 2014, at approximately 12:20 p.m., investigating agents met CS#2[16] at a predetermined location in Jamaica, New York.  During this meeting, agents

---

[15] As set forth below, EARL DAVIS also sold heroin to a confidential source on December 14, 2014 contained in glassine packets bearing the stamp of a gold foil circle with a black fist and the word "Power" emblazoned on the fist.  Additionally, on or about November 19, 2014, law enforcement officers arrested an individual named Kahseem Spencer in the vicinity of 177-38 106th Road, Jamaica, New York.  At the time of his arrest, Spencer possessed 14 glassines of heroin.  4 of the 12 glassines of heroin bore the mark of a gold foil circle with a black fist and the word "Power" emblazoned on the fist.

[16] CS#2 has been a confidential source for approximately 2 years.  In January 2012, CS#2 was arrested in New York for conspiring to distribute cocaine.  CS#2 pleaded guilty to federal narcotics charges, and was sentenced to 18 months of incarceration.  CS#2 has since cooperated with the DEA by providing leads in narcotics investigations, in return for a reduction to his sentence.  The information provided by CS#2 has been reliable and credible, and has been corroborated by several seizures of narcotics in the New York area.

searched CS#2 for contraband, with negative results.   Agent then gave CS#2 approximately $200.   At approximately 12:35 p.m., CS#2 sent a text message to DAVIS, informing DAVIS that CS#2 was on his/her way to DAVIS's residence.   DAVIS did not send CS#2 a response. At approximately 12:40 p.m., agents observed CS#2 travel to the vicinity of Liberty Park.   At approximately 12:50 p.m., investigating agents who were performing surveillance in the vicinity of Liberty Park observed CS#2 walk from Liberty Park to 173rd Street and Liberty Avenue, and then walk on 106th Road toward the residence located at 177-38 106th Road. CS#2 then entered the residence.   At approximately 1:21 p.m., CS#2 contacted investigating agents and advised them that he/she had received narcotics from DAVIS, and agents observed CS#2 walk to the vicinity of Liberty Park.

73.   At approximately 1:35 p.m., investigating agents met CS#2 at a predetermined location.   During the meeting, CS#2 gave investigating agents two bundles of heroin in a clear plastic bag.   The bundles of heroin were marked with a gold foil circle with a black fist and the word "Power" emblazoned on the fist.

74.   On January 7, 2015, DAVIS sold another batch of heroin to CS#2.   At approximately 10:00 on January 7, 2015, CS#2 spoke to DAVIS, and arranged to purchase 2 bundles (20 glassines) of heroin from him.   At approximately 12:00 p.m. that day, investigating agents met CS#2 at a predetermined location in Jamaica, New York.   During this meeting, agents searched CS#2 for contraband.   The search yielded negative results.   During the meeting, agents also gave CS#2 $200.

75.     At approximately 12:10 p.m., CS#2 departed from the predetermined location.   At approximately 12:13 p.m., investigating agents observed CS#2's vehicle travel to 173rd Street and Liberty Avenue, and park on 173rd Street.   At 12:19 p.m., agents observed CS#2 walk towards DAVIS's residence, which was located on 106th Road.   At approximately 12:32 p.m., CS#2 sent a text message to investigating agents indicating that the narcotics transaction was complete.   At approximately 12:41 p.m., investigating agents observed CS#2 walking near the intersection located at 173rd Street and Liberty Avenue.   Agents then observed CS#2 enter his/her vehicle.   Thereafter, CS#2 met agents at a predetermined location, where he/she handed the agents 2 bundles (20 glassines) of heroin contained in a black plastic bag.   CS#2 also described the narcotics transaction to the agents at the predetermined location. In substance and in part, CS#2 stated that he/she entered DAVIS's residence, gave DAVIS $200, and asked DAVIS for 2 bundles of heroin.   DAVIS then gave CS#2 5 glassines of heroin.   Thereafter, DAVIS departed to the backyard of the residence and returned with FNU LNU (also known as "Frank"), who gave CS#2 an additional 15 glassines of heroin.   After Frank gave CS#2 15 glassines of heroin, Frank also gave CS#2 his telephone number, and told CS#2 that if he/she needed anything he/she could contact him at that number.

76.     Intercepted telephone calls over the 4421 TELEPHONE also reveal evidence of DAVIS's narcotics trafficking activities.   For example, on May 2, 2015, investigating agents intercepted the following telephone call between DAVIS and TRAPPIER, who was using the 4421 TELEPHONE, during which DAVIS arranged to purchase a sleeve of heroin from TRAPPIER:

TRAPPIER:          Hello.

DAVIS:               Yeah, you want to come down the block?

| | |
|---|---|
| TRAPPIER: | You might have [U/I] truck. |
| DAVIS: | Huh? |
| TRAPPIER: | They may gotta walk down because they are putting cement down. |
| DAVIS: | Yeah, I'mma walk. |
| TRAPPIER: | Alright, what you want? |
| DAVIS: | I need a whole one. |
| TRAPPIER: | Alright. |
| DAVIS: | I'll be right there. |
| TRAPPIER: | Alright. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call DAVIS asked TRAPPIER to meet him so that he could purchase heroin from her (i.e., "Yeah, you want to come down the block?"). TRAPPIER later told DAVIS, due to construction in the area, he would have to walk to an unspecified location to purchase the heroin (i.e., "They may gotta walk down because they are putting cement down"), and asked DAVIS how much heroin he needed (i.e., "Alright, what you want?"). DAVIS replied that he needed a sleeve of heroin (i.e., "I need a whole one"), and TRAPPIER responded affirmatively (i.e., "Alright"). DAVIS then stated that he would come to TRAPPIER's location immediately (i.e., "I'll be right there").

77.    On June 14, 2015, investigating agents intercepted the following telephone call between TROTTER, who was using the 4421 TELEPHONE, and DAVIS, during which DAVIS asked TROTTER to supply him with a bundle of heroin:

| | |
|---|---|
| DAVIS: | You around? |

| TROTTER: | Yeah. |
| DAVIS: | I need to see you. |
| TROTTER: | About? |
| DAVIS: | A whole one.   Where you want me to meet you? |
| TROTTER: | You know. |
| DAVIS: | Same place? |
| TROTTER: | Yeah. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call DAVIS told TROTTER that he need to meet with him (i.e., "I need to see you"). DAVIS then asked TROTTER to sell him a sleeve or bundle of heroin and asked TROTTER where TROTTER wanted to meet to deliver the sleeve or bundle (i.e., "A whole one.   Where you want me to meet you?").   TROTTER replied that DAVIS knew where to meet him (i.e., "You know"), and DAVIS asked TROTTER if it was the same location where they had previously met to conduct a narcotics transaction (i.e., "Same place?").   TROTTER replied affirmatively (i.e., "Yeah").

**MICHAEL SCOTT**

78.   Intercepted communications have also revealed that SCOTT purchases large quantities of heroin from TRAPPIER and POWELL, which he then distributes on behalf of the DTO.   For example, on February 13, 2015, investigating agents intercepted the following telephone call between POWELL, who was using the 4421 TELEPHONE, and SCOTT, during which SCOTT attempted to purchase a sleeve (100 glassines) of heroin from POWELL:

| POWELL: | Hello! |

| | |
|---|---|
| SCOTT: | Yeah what up baby? |
| POWELL: | Yo what up? |
| SCOTT: | Yeah I'm on my way down there.   I need the whole thing, okay? |
| POWELL: | One whole one? |
| SCOTT: | Yeah, yeah, like I need uh, like the whole sleeve. |
| POWELL: | I don't got, I only got two bonds left. |
| SCOTT: | What? |
| POWELL: | Yeah. |
| SCOTT: | Come on!   So how long before you be good?   I'll wait, I mean can't do nothing with that. |
| POWELL: | Well once I am done with the one I got.   [ASIDE: Hold on Grandma.]   Um-hum…, I don't know when I'm done with this bro. |
| SCOTT: | All right. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call SCOTT told POWELL that he was traveling to his location and needed to purchase a sleeve of heroin (i.e., "Yeah I'm on my way down there.   I need the whole thing, okay?").   POWELL asked SCOTT to clarify if he needed an entire sleeve of heroin (i.e., "One whole one?"), and SCOTT reiterated that he needed an entire sleeve (i.e., "Yeah, yeah, like I need uh, like the whole sleeve").   POWELL told SCOTT that he only had 2 bundles of heroin remaining (i.e., "I don't got, I only got two bonds left").   Thereafter SCOTT told POWELL that he needed more than 2 bundles of heroin to distribute (i.e., "I'll wait, I mean can't do nothing with that").

79.     On February 19, 2015 at approximately 8:48 p.m., investigating agents intercepted another telephone call between SCOTT and POWELL, who was using the 4421 TELEPHONE, during which SCOTT arranged to purchase 2 sleeves (200 glassines) of heroin from POWELL to distribute on behalf of the DTO:

| | |
|---|---|
| POWELL: | Yo. |
| SCOTT: | Hey Yo listen I need two full ones.   What is she…what am I gonna get for that? |
| POWELL: | [U/I] |
| SCOTT: | What happened? |
| POWELL: | It's one-forty. |
| SCOTT: | No, no. |
| POWELL: | Yo. |
| SCOTT: | Two full… full ones.   Twenty of them.   You know what I mean? |
| POWELL: | Yeah. |
| SCOTT: | Not the little ones.   Big one, two full big ones. |
| POWELL: | Oh, two… two whole sleeves? |
| SCOTT: | Yeah. |
| POWELL: | Hold on. |

Based on my training, experience and knowledge of the investigation, I believe that SCOTT told POWELL that he needed 2 sleeves (200 glassines) of heroin, and asked POWELL to specify the price of that quantity of heroin (i.e., "Hey Yo listen I need two full ones.   What is she… What[STUTTERS] am I gonna get for that?").   POWELL told SCOTT that the cost of 2 bundles of heroin was $140 (i.e., "Its one-forty").   SCOTT then clarified that he was asking for

2 sleeves of heroin, or 20 bundles (i.e., "Two full… full ones.   Twenty of them.   You know what I mean?").   POWELL replied that he understood (i.e., "Yeah"), and SCOTT reiterated that he needed 2 sleeves of heroin (i.e., "Not the little ones.   Big one, two full big ones").   POWELL replied by asking SCOTT to confirm that he needed 2 whole sleeves of heroin (i.e., "Oh, two… two whole sleeves?"), and SCOTT confirmed that he needed 2 sleeves of heroin (i.e., "Yeah").   POWELL then asked SCOTT to wait (i.e., "Hold on").

80.   Approximately 1 minute after the above-referenced telephone call, investigating agents intercepted the following telephone call between SCOTT and POWELL:

| | |
|---|---|
| SCOTT: | Yeah go ahead. |
| POWELL: | The best I could is 680 a piece.   You heard? |
| SCOTT: | Alright, I'll call you when I'm close. |

Based on my experience and knowledge of the investigation, I believe that during this telephone conversation POWELL told SCOTT that the cost of 1 sleeve of heroin was $680 (i.e., "The best I could is 680 a piece.   You heard?").   SCOTT replied that he understood and would call POWELL when he was approaching his location to purchase the heroin (i.e., "Alright, I'll call you when I'm close").   At approximately 10:11 p.m., SCOTT sent a text message to POWELL stating "On my way now coming from Long Island need 2 sleeves," and approximately one minute later SCOTT sent a text message to POWELL stating "like 45 mins," and POWELL replied with a text message stating "Ok."

81.   Four days later, on February 23, 2015 at approximately 8:36 p.m., SCOTT called TRAPPIER asking to purchase 1 ½ sleeves of heroin to distribute.   During this telephone call, the following conversation occurred between TRAPPIER and SCOTT:

| | |
|---|---|
| SCOTT: | What's up baby? |

| TRAPPIER: | Ain't shit, what's good? |
|---|---|
| SCOTT: | Chilling, I was in the bed all day.   I need to come see you. I need to know what you gonna do for one and a half. |
| TRAPPIER: | Oh, oh damn… one in a half? |
| SCOTT: | Yeah, a sleeve and a half. |
| TRAPPIER: | I don't know… I'ma calculate it and I'll text it to you. |
| SCOTT: | Aight, calculate it and call me right back. |
| TRAPPIER: | Um-hum. |

Based on my training, experience and knowledge of the investigation, I believe that during this telephone call SCOTT told TRAPPIER that he needed to purchase heroin, and asked for the price of 1 ½ sleeves (150 glassines) of heroin (i.e., "I need to come see you.   I need to know what you gonna do for one and a half").   TRAPPIER then asked SCOTT to confirm that he needed 1 ½ sleeves of heroin (i.e., "Oh, oh damn… one in a half?"), and SCOTT confirmed that he needed "a sleeve and a half" of heroin.   TRAPPIER told SCOTT that she would determine the price and then contact him (i.e., "I'ma calculate it and I'll text it to you"), and SCOTT asked TRAPPIER to calculate the price and call him (i.e., "Aight, calculate it and call me right back").

82.   At approximately 8:38 p.m., TRAPPIER sent SCOTT a text message which states "1,030."   Based on my knowledge of the investigation, I believe that in this text message TRAPPIER informed SCOTT that the cost of 1 ½ sleeves of heroin was $1,030. Approximately 3 minutes later, SCOTT called TRAPPIER and the following telephone conversation ensued:

| TRAPPIER: | Yo! |
|---|---|
| SCOTT: | Oh that's the regular price?   That's six-eighty and three-fifty right? |

| | |
|---|---|
| TRAPPIER: | No, that's for the…. For the sleeve I gave you four of them for the price that I paid and the other six I gave you for seventy.  I gave you four to sixty and six for seventy and, um-hum… the five I couldn't do nothing with because[…] |
| SCOTT: | Aight. |
| TRAPPIER: | Aight. |

Based on my experience and knowledge of this investigation, I believe that during this telephone call SCOTT asked TRAPPIER if $1,030 included $680 for the cost of 1 sleeve of heroin, and $350 for the cost of ½ sleeve of heroin (i.e., Oh, that's the regular price?   That's six-eighty and three-fifty right?").   TRAPPIER then informed SCOTT that $1,030 was the cost of a sleeve she had previously given him (i.e., "No, that's for the… for the sleeve I gave you"), and itemized the other costs associated with narcotics she sold to SCOTT (i.e., "four of them for the price that I paid and the other six I gave you for seventy.   I gave you four for sixty and six for seventy and, um-hum… the five I couldn't do nothing with because…").   SCOTT stated he understood (i.e., "Aight").

83.    At 8:51 p.m., investigating agents intercepted a telephone call between SCOTT and TRAPPIER, during which they arranged to meet at a location they referred to as the "church" to execute the above-described heroin transaction:

| | |
|---|---|
| TRAPPIER: | Yo! |
| SCOTT: | Hey yo, where you wanna go at?   The church? |
| TRAPPIER: | Yeah. |
| SCOTT: | Aight I'll be… I'ma be there in like five minutes [s]o you might as well start getting ready. |
| TRAPPIER: | Uh-huh. |

SCOTT:                   All right baby.

Based on my training, experience and knowledge of the investigation, I believe that during this

telephone call SCOTT asked TRAPPIER if she wanted to meet at a location he referred to as

"The church" (i.e., "Hey yo, where you wanna go at?   The church?"),[17] and TRAPPIER

replied affirmatively (i.e., "Yeah").   SCOTT then told TRAPPIER he would be there within 5

minutes (i.e., "I'ma be there in like five minutes").   At approximately 9:07 p.m. SCOTT called

TRAPPIER and told her "I'm here baby", indicating that he had arrived at the location of their

planned heroin transaction.

## ANDRE MITCHELL[18]

84.    Finally, the investigation has revealed that MITCHELL distributes the

"King Kong," "Universal," "Coca Cola" and "Sweet Dreams" brands of heroin on behalf of the

---

[17]  Members of the DTO frequently conduct their narcotics transactions in the vicinity of the
structure that TRAPPIER and SCOTT refer to as the "church."   For example, on March 1,
2015, investigating agents intercepted a following telephone call between POWELL, who was
using the 4421 TELEPHONE, and an individual named "Musa," during which POWELL
directed MUSA to meet him "[b]ehind the church" so that POWELL could supply MUSA with
"2."
          On February 27, 2015, investigating agents intercepted a following telephone
call between an individual named "Waz" and TRAPPIER, who was using the 4421
TELEPHONE, during which TRAPPIER arranged to sell Waz four units of heroin, which she
referred to as four "t-shirts" "[b]ehind the church."

[18]  The investigation has revealed that MITCHELL (also known as "Bright") is a member of the
PCG/POV City sect of the Bloods gang.   Specifically, on June 20, 2015, a photograph was
captured on MITCHELL's Instagram account, which, at the time was named "pcg_bright,"
depicting a .9 millimeter Glock pistol laid on top of a blue bandana.   In addition, in April 2015,
a photograph was posted on MITCHELL's Instagram account, which was named
"pcg_king_koopa83" at the time, which depicts a gold chain with a pendant stating "POV
CITY."   This Instagram account contains numerous photographs of a male, which law
enforcement officers have identified as MITCHELL.   The username for MITCHELL's
Instagram account, which, as stated above is "pcg_king_koopa83" states the following:
"Paper_chasin_Bright.   Can't get paid on a earth this big your worthless kid…   Black Market.
Paper Boyz…. Pov City Gangsta83 M8v3n!!!!".

DTO.

85.     For example, on March 4, 2015, a law enforcement officer working in an undercover capacity ("UC#2") called MITCHELL at approximately 7 p.m.   During this telephone call, MITCHELL told UC#1 to meet him in the vicinity of 11th Avenue and 175th Street in Queens, New York.   At approximately 7:50 p.m., UC#2 drove to this location and called MITCHELL, who stated that he would arrive shortly.   Shortly thereafter, MITCHELL arrived in a blue standard utility vehicle ("SUV") and walked to UC#2's vehicle.   MITCHELL Then entered UC#2's vehicle and handed him/her 3 bundles (30 glassines) of heroin stamped "King Kong."   In exchange for the heroin, UC#2 handed MITCHELL $270.   MITCHELL then told UC#2 in substance and in part that the next time they conducted a heroin transaction MITCHELL would sell UC#2 one sleeve (100 glassines) of heroin for $800.   MITCHELL and UC#2 then continued negotiating the price of a sleeve of heroin, and MITCHELL agreed to sell UC#2 a sleeve of heroin for $725.

86.     On March 18, 2015 at approximately 7:30 p.m., UC#2 called MITCHELL to arrange a narcotics transaction.   During the ensuing telephone conversation, UC#2 asked MITCHELL, in substance and in part, to sell him/her one sleeve of heroin, and MITCHELL agreed, but noted that the price of heroin would be $900.   During the telephone call MITCHELL directed UC#2 to meet him in the vicinity of Jamaica Avenue and 207th Street in Queens, New York at approximately 8:10 p.m.   At approximately 8:15 p.m., UC#2 traveled to the vicinity of Jamaica Avenue and 207th Street and called MITCHELL.   Several minutes later, MITCHELL approached UC#2's vehicle and entered the vehicle.   MITCHELL then handed UC#2 10 bundles (one sleeve) of heroin bearing the stamp "Universal."   In exchange for the heroin, UC#2 handed MITCHELL $900.

87.     In addition to the aforementioned narcotics transactions, as set forth above, MITCHELL was arrested on May 6, 2015.  At the time of his arrest, MITCHELL possessed 43 glassines (approximately 4 bundles) of heroin bearing the stamp "Sweet Dreams," At the time of MITCHELL's arrest, he also possessed 4 cellular telephones, 31 rounds of .45-caliber ammunition and a bullet-proof vest.

88.     Moreover, intercepted telephone calls between members of the DTO also reveal MITCHELL's role as a distributor within the DTO.  For example, on May 15, 2015, investigating agents intercepted a telephone call between LAMBUS and CURRY, during which they discussed their narcotics trafficking activities.   During this telephone call, which is explained in detail above,[19] LAMBUS told CURRY, in sum and substance, that MITCHELL, who he referred to as "Dre," had previously distributed heroin for CURRY, but was taking some of CURRY's heroin customers.  Moreover, as explained above, on May 6, 2015, investigating agents arrested MITCHELL while he was in possession of approximately 43 glassines of heroin labeled "Sweet Dreams."   At approximately 11:18 p.m. on May 6, 2015 – which was approximately 5 hours after MITCHELL's arrest – investigating agents intercepted the following telephone call between LAMBUS and an unknown male ("UM#6"), during which LAMBUS discussed MITCHELL's arrest and advised UM#6 to ensure that he did not have any narcotics in his residence:

UM#6:              Yo!

LAMBUS:          Yo you know what happened with Dre today right?

UM#6:              Yeah.

---

[19]  A more fulsome description of this telephone call is set forth in paragraph 47.

| | |
|---|---|
| LAMBUS: | Yeah, I just… saying you don't fuck… what you call it. |
| UM#6: | Huh? |
| LAMBUS: | Hope you don't be having nothing in your crib or nothing like that. |

Based on my experience and knowledge of the investigation, I believe that during this telephone call LAMBUS asked UM#6 if he heard about MITCHELL's arrest earlier that day (i.e., "Yo you know what happened with Dre today right?"), and UM#6 replied that he had heard about MITCHELL's arrest (i.e., "Yeah").   LAMBUS then warned UM#6 to ensure that he did not have any narcotics at his residence (i.e., "Hope you don't be having nothing in your crib or nothing like that").

89.    At approximately 12:22 p.m., LAMBUS also called FULLER to report the news of MITCHELL's arrest and to discuss why MITCHELL had been arrested.   During this conversation, which was intercepted by investigating agents, the following conversation ensued:

| | |
|---|---|
| LAMBUS: | Aight, what I was gonna say?   This nigga Loggy Jo [Phonetic], Loggy Dre [Phonetic] crib got raided today. |
| FULLER: | Who? |
| LAMBUS: | Dre. |
| FULLER: | Get out of here, for what? |
| LAMBUS: | I don't know… I guess too many sales out there, by his crib.   He lives like down Jamaica Avenue, like going towards Hempstead. |
| FULLER: | Wow, they took him? |
| LAMBUS: | Yeah, they took him. |
| FULLER: | What they found? |

LAMBUS:          Probably whatever he had.

FULLER:          Wow, they probably had niggas pulling up to his house.

LAMBUS:          Yeah, he probably had people coming up there, and he had them white boys he be dealing with.   They probably be coming over there by his crib and shit.

Based on my experience and knowledge of the investigation, I believe that during this telephone call, LAMBUS told FULLER that MITCHELL's residence was searched by law enforcement officers (i.e., "Loogy [Phonetic] crib got raided today").   FULLER then asked LAMBUS to specify whose residence was searched (i.e., "Who?"), and LAMBUS clarified that MITCHELL's residence was searched (i.e., "Dre").   FULLER then asked why MITCHELL's residence was searched (i.e., "Get out of here, for what?"), and LAMBUS replied that MITCHELL had been selling too much narcotics near his residence, which is located on Jamaica Avenue near Hempstead (i.e., "I don't know… I guess too many sales out there, by his crib.  He lives like down Jamaica Avenue, like going towards Hempstead").   FULLER then asked if MITCHELL had been arrested (i.e., "Wow, they took him?"), and LAMBUS replied that law enforcement officers arrested MITCHELL (i.e., "Yeah, they took him").   FULLER asked LAMBUS to specify what narcotics they found in MITCHELL's residence (i.e., "What they found?"), and LAMBUS replied that they found whatever narcotics MITCHELL had stored in his residence (i.e., "Probably whatever he had").   Thereafter, LAMBUS speculated that MITCHELL probably had customers purchasing heroin directly from his residence (i.e., "Yeah, he probably had people coming up there, and he had them white boys he be dealing with.   They probably be coming over there by his crib and shit").

WHEREFORE, your deponent respectfully requests that the defendant KAMEL

LAMBUS, also known as "Kamel Angevine" and "K," STANLEY FULLER, also known as "Wardy" and "Webo," SHAVONA TRAPPIER, also known as "Bobby," SHAKEEM POWELL, TRYAN TROTTER, also known as "Ty" and "Terry," first name unknown ("FNU") last name unknown ("LNU"), also known as "Chris," HENRY CURRY, also known as "Junior," SEAN BRABRAM, also known as "Grinch" and "Lye," TIHEEM CROCKER, FNU LNU, also known as "Pop," SCOTT WILLIAMS, EARL DAVIS, also known as "Choice," MICHAEL SCOTT, also known as "Ross," and ANDRE MITCHELL be dealt with according to law.

S/ Christopher Popolow

_____
CHRISTOPHER POPOLOW
Special Agent, United States Department of
Homeland Security, Homeland Security
Investigations

Sworn to before me this
1st day of July, 2015

S/ Roanne L Mann

_____
THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK